NESTOR *v.* STATE

[No. 276, September Term, 1965.]

*Decided July 19, 1966.*

The cause was argued before HAMMOND, HORNEY, MAR-BURY, BARNES, and McWILLIAMS, JJ.

*Michael Lee Kaplan,* with whom was *Morris Lee Kaplan* on the brief, for appellant.

*Edward L. Blanton, Jr., Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, Charles E. Moylan, Jr.* and *Edward Angeletti, State's Attorney,* and *Assistant State's Attorney,* respectively, *for Baltimore City,* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, Richard Nestor, was indicted on April 13, 1965 in the Criminal Court of Baltimore as follows: No. 1434, assault; No. 1435, larceny; No. 1436, receiving stolen goods, and No. 1437, receiving stolen goods. Pleas of not guilty were entered and Nestor was tried without a jury (William J. O'Donnell, J.), beginning May 7, 1965. On May 11, 1965 he was found guilty as to all charges and was sentenced to six months. (No. 1434), eighteen months (No. 1435), three years (No. 1436), and three years (No. 1437)—all terms to be served consecutively in the Maryland Penitentiary.

On this appeal Nestor contends that: (1) the trial court allowed into evidence items taken from his apartment as a result of an illegal search and seizure, and (2) the nature of questions asked by the trial court indicated prejudice and bias against Nestor.

Frances Hankewycz testified that she and her child had lived with Nestor from November, 1964 to March 18, 1965. On February 15, 1965 they both rented an apartment at 211

Preston Street, Baltimore City. On March 18 Nestor and Mrs. Hankewycz had a lover's quarrel and she went with her mother to the apartment on Preston Street to get her child and some of her clothes. Nestor met them at the door, brandished a shotgun and began to beat Mrs. Hankewycz. She left with her child, but without taking any of her clothes or the child's toys.

On March 22, 1965 Mrs. Hankewycz swore out a warrant against Nestor for assault. Mrs. Hankewycz accompanied two Baltimore City police officers to 211 E. Preston Street where the warrant was served on Nestor at 8:30 p.m. on the night of March 22. Nestor met the police at the door of the apartment. After they showed him the warrant he immediately agreed to accompany the officers but told them they could not enter the apartment. Mrs. Hankewycz told Nestor that she wanted to get her clothes, and he said they were not at the apartment but had been sent to his brother's house.

Nestor left the police officers and Mrs. Hankewycz standing inside the doorway of the apartment and he went into the bedroom in order to comb his hair and dress before he accompanied them. The police testified that Nestor "acted very funny, running around * * *, hollering out, 'Frances you shouldn't have done this, you know what you're putting me into.' " After Nestor went into the bedroom, one of the police officers signaled another policeman outside on the street, who was covering the rear of the premises, that he should send for the patrol wagon.

Mrs. Hankewycz then asked the officers if she could go into the living room to get her things, and they answered that they didn't see why not, that she had every right to take her clothing. She went into the living room and approached the closet where she kept her belongings. Mildred Srebsoski (Mildred), who was in the apartment when the warrant was served on Nestor, exclaimed "don't go in that closet." Mrs. Hankewycz opened the closet door and a golf bag with clubs fell out on top of her. Not only were her clothes not in the closet, but it contained silverware, swords, the golfing equipment and clothes; all of which proved to be stolen goods.

After Mrs. Hankewycz opened the closet door, she called for the police to come into the living room. They entered, observed

the articles in the closet and asked Mrs. Hankewycz whether they were her property. When she answered that they did not belong to her, the officers took Nestor and Mildred into custody along with another man who was sleeping in the bedroom while all this was taking place.[1] The police took photographs of the closet and seized its contents. There is no testimony that a general search of the apartment was made and the trial court found that the police did not search the apartment at all, but merely seized the contents of the closet, which were open and in plain view.

## 1.

Nestor's counsel on this appeal argues that the police trespassed when they entered the living room of the apartment at Mrs. Hankewycz's invitation since on March 22 she was no longer a co-tenant and had no rights in the premises. It is urged that the articles seized from the closet should not have been introduced into evidence against Nestor at his trial.

Nestor apparently paid the first week's rent for the apartment. All other payments which became due up until March 17 were paid by Mrs. Hankewycz exclusively out of her earnings. Nestor and Mrs. Hankewycz had their altercation on March 18 and he was arrested on March 22. Rent was to have been paid again on March 24.

It is argued that Mrs. Hankewycz abandoned the apartment or was "evicted" on March 18, and since she had paid no rent covering the period after March 17, she was not a co-tenant and had no rights in the premises on March 22 when she accompanied the police officers to the apartment and Nestor was arrested.

We accept the trial court's determination that the co-tenancy had not been terminated as of March 22. Mrs. Hankewycz kept her key to the apartment, no locks had been changed, the land-

---

1. Mildred Srebsoski was charged jointly with Nestor in indictment No. 1436 (receiving stolen goods). She was convicted and sentenced to not more than six months in the Maryland Correctional Institution for Women. Sentence was suspended and she was placed on probation for one year. She has not appealed. The man found asleep in the apartment was not charged.

lady had not been informed that Mrs. Hankewycz was no longer a tenant, Mrs. Hankewycz's belongings were at the apartment on March 18 and some of her things were still there on March 22. She testified that she had planned to pay the rent on March 24. Furthermore, testimony of the landlady tended to show that even Nestor did not consider Mrs. Hankewycz to have abandoned her co-tenancy with him in the apartment. The landlady testified that she was told by Nestor that he was going to see whether or not "his wife" came back to him, and that if she didn't return by March 24 he would be giving up the apartment.

Mrs. Hankewycz, as co-tenant, was not a trespasser when she entered the apartment on March 22 to see if her belongings were still there. When surprised by what she had found in the closet, she asked the police officer to come in from the hall. The rule is well established that one co-tenant may give consent to a search and the evidence there disclosed can be used against the other tenant whose permission to enter and search the premises had not been elicited. See *Nelson v. California,* 346 F. 2d 73, 77 (9th Cir. 1965). See also *Bellam v. State,* 233 Md. 368, 196 A. 2d 891 (1964) and the cases and authorities therein cited.

In *Bellam v. State, supra,* we held that a wife could consent to the entrance and search of premises jointly occupied by her and her husband, and articles found during the search could be introduced against the husband at his trial. As we indicated in *Bellam,* in the case of a husband and wife, the consent of one co-tenant may bind the other, does not stem from the implication that a consenting tenant may waive the other's constitutional rights against trespass and unreasonable searches and seizures, but rather from the possessory rights of the co-tenant to admit to the jointly controlled premises whomsoever he wishes, including police officers.

As we have already pointed out, however, Nestor informed the police officers at the door of his apartment that he would submit to arrest, but that he did not want them to enter the premises. In *Tompkins v. Superior Court,* 59 Cal. 2d 65, 27 Cal. Rptr. 889, 378 P. 2d 113 (1963) a co-tenant was arrested for a narcotics violation. He gave police the key to his apartment and told them that they could go there and search the

premises. The police went to the apartment without a warrant for arrest or search and attempted to open the door. The other co-tenant, who was inside the apartment, opened the door on the chain, saw the police officers (who identified themselves to him) and slammed the door shut. The police then broke the door down, entered the apartment, searched it, found marijuana and arrested the co-tenant and another man who were both inside the apartment at that time. In holding that the police officers committed a trespass and made an unreasonable search and seizure, Justice Traynor said:

> "Joint occupancy of property, particularly residential property, obviously demands reasonable restrictions on the right of each joint occupant either by himself or through another to exercise full control over the property at all times regardless of the wishes of another joint occupant present on the premises. A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession." (Citation omitted). (Page 116 of 378 P.2d).

See also *Lucerno v. Donovan,* 354 F. 2d 16 (9th Cir. 1966).[2]

The specific holding in *Tompkins* was narrowed to the particular facts present in that case:

> "Accordingly, we hold that one joint occupant who is away from the premises may not authorize police officers to enter and search the premises over the objection of another joint occupant who is present at the time, at least where as in this case, no prior warning is given, no emergency exists, and the officer fails even to disclose his purpose to the occupant who is

---

2. In this case the police arrested a man for narcotics violations and obtained his consent to search what he claimed to be his apartment. His sister lived at the apartment. The record was unclear, but the court doubted whether he resided with his sister. The evidence tended to establish that he had been a "welcome visitor from time to time." Any authority, however, which he had to consent to a search of the apartment was rescinded by the sister's expressed protest to entry by the police.

present or to inform him that he has the consent of the absent occupant to enter." (Page 116 of 378 P. 2d).

Although *Tompkins* and *Lucerno,* both *supra,* are distinguishable upon their facts from the situation presented in this case, we need not decide whether Mrs. Hankewycz's invitation to the police officers to enter the apartment removed them from the category of trespassers, in view of Nestor's prior clearly expressed statement that he did not want the police to come in. The police officers were not trespassers, but had a right to enter the apartment under the circumstances present in this case because of the authority of their warrant for Nestor's arrest.

The police testified that they arrested Nestor in the hallway of his apartment. They were lawfully on the premises under a warrant for Nestor's arrest. See *Gault v. State,* 231 Md. 78, 188 A. 2d 539 (1963). The right to privacy in one's home does not extend to when he is validly arrested there. If necessary, the police may forcibly enter his dwelling to make the arrest and do not become trespassers in so doing. *Franklin v. State,* 208 Md. 628, 119 A. 2d 439 (1956). See *Preston v. United States,* 376 U. S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964) ; *Ker v. California,* 374 U. S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963).

As we have indicated after Nestor was presented with the warrant for his arrest he left the hallway and went into the bedroom. The police officers remained standing in the hallway. Mrs. Hankewycz, as a co-tenant of the apartment, was no trespasser in entering the living room to see if her belongings were still there. When Mrs. Hankewycz approached and opened the closet door and the resulting uproar ensued, the police were more than justified in coming from the hallway into the living room in order to investigate what was happening. They were justified in coming in even without Mrs. Hankewycz's invitation, under the authority of their warrant for Nestor's arrest —to insure their own protection and to take security measures against Nestor's possible escape. See footnote four in *Stoner v. California,* 376 U. S. 483, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964) and *Agnello v. United States,* 269 U. S. 20, 30, 46 S. Ct. 4, 70 L. Ed. 145 (1925).

When the officers entered the living room, their observation of the contents of the closet in plain view did not constitute a search. *Kershaw v. State*, 199 Md. 135, 85 A. 2d 783 (1952). See also *United States v. Lee*, 308 F. 2d 715, 717 (4th Cir. 1962). The fact that the articles seized from the closet were unconnected with the offense for which Nestor was arrested does not violate the legality of the seizure. *Crowe & Williston v. State*, 240 Md. 144, 213 A. 2d 558 (1965).

Nestor's counsel argues here, as he did in the trial court, that the arrest on charges of assault was a mere pretext to gain admission to the apartment in order to search for stolen goods. When Mrs. Hankewycz accompanied the police to the apartment on the evening of March 22nd, she did relate to them that she had observed something "suspicious" about Nestor bringing in a suitcase and that Nestor "may have been stealing things." Mrs. Hankewycz had no conversation with any police officers relating to possible thefts until after Judge Hudnut of the Municipal Court of Baltimore City issued the warrant for Nestor's arrest.

There is no evidence of any preconceived plan that Mrs. Hankewycz should get an arrest warrant as to a means of effecting a search of the apartment where Nestor was living. Moreover, no general search of the apartment was ever made. The officers, after making the arrest and while waiting for Nestor to dress, were content to remain just within the doorway of the apartment until the unusual circumstances we have just recounted called for their presence in the living room. Only the contents of the closet were seized and those articles were in plain and open view.

Nestor argues that the nature of questions asked by the trial court indicated prejudice and bias against him. He did not testify at his trial. It is apparent from a study of the record in this case that the questions by the trial court were asked solely for the purpose of clarifying the testimony of witnesses for the State and for the defense, and that at no time did the conduct of the trial court cross "the line of impartiality over which the judge must not step." *Vandegrift v. State*, 237 Md. 305, 311, 206 A. 2d 250, 254 (1965). See also *Elmer v. State*, 239 Md. 1, 209 A. 2d 776 (1965).

*Judgment affirmed.*