69 A.3d 36

**Brian Lee MOULDEN**

v.

**STATE of Maryland.**

**No. 750, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 26, 2013.

332

334

Brian M. Saccenti (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Jeremy M. McCoy (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: EYLER, DEBORAH S., MEREDITH, JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

KENNEY, J.

This appeal arises from judgments against Brian Lee Moulden, appellant, in the following cases in the Circuit Court for Anne Arundel County:

- In Case No. K–10–2130, appellant was convicted by a jury of the robbery, second degree assault, and theft of Taylor Stevens. He was sentenced on the robbery conviction to fifteen years incarceration (five years suspended) and five years probation, beginning October 19, 2010. That sentence was to run concurrent to the sentence imposed in Case No. K–10–2231. The remaining convictions were merged for the purposes of sentencing.

- In Case No. K–10–2131, appellant was convicted by a jury of the robbery, second degree assault, reckless endangerment, and theft of Vincente Ramirez. He was

sentenced on the robbery conviction to twelve years incarceration (four years suspended) and five years probation, beginning October 19, 2010. The remaining convictions were merged for the purposes of sentencing.

● In Case No. K–10–2230, appellant was convicted by the court based on an agreed statement of facts of the robbery of Sarai Justo Prospero. He was sentenced to fifteen years incarceration (all fifteen years suspended) and five years probation.

● In Case No. K–10–2231, appellant was convicted by the court based on an agreed statement of facts of the robbery of Tony Alfaro. He was sentenced to fifteen years incarceration (five years suspended) and five years probation, beginning October 19, 2010. That sentence was to run concurrent to the sentence imposed in Case No. K–10–2130.

On appeal, appellant presents three questions for our review, which we have revised as follows:

I. Did the circuit court err in denying his motion to suppress?

II. In Case No. K–10–2230, did the circuit court impose an illegal sentence in violation of the plea agreement?

III. In Case No. K–10–2131, was the evidence sufficient to support his conviction for reckless endangerment?

For the reasons set forth below, we answer "no" to questions I and III, and "yes" to question II.

## MOTION TO SUPPRESS

### *Facts*

On April 4 and 8, 2011, the parties came before the court on appellant's motion to suppress "physical items seized," "statements," and "some subsequent photo arrays" that were allegedly the "fruit" of "one specific stop" involving appellant. As explained by appellant's counsel, evidence obtained and statements made as the result of this stop "leads to . . . five cases," including the four in the instant appeal.

Detective John Murphy testified that, in the fall of 2010, he was investigating several robberies that had occurred in the area of Thom and Forest Drives in the Quiet Waters Village community of Annapolis. According to Detective Murphy, police had formed a "suspect description" based on descriptions given by the robbery victims: "[b]lack male, six foot, cornrows, dreads, and slight facial hair." Police had also been "made aware" that the suspect went by the nickname "B."

On October 18, 2010, a robbery occurred in Quiet Waters Village. The suspect was described as a "[b]lack male, wearing cornrows" and riding a dark-colored bicycle. The next day, Detective Murphy was watching a "live feed" of "the Bens Drive area, the Marcs Court, which is across the street from Quiet Waters." He observed "two subjects ... on [bicycles] at the bottom of Marcs Court. One was on a bike that was darker in color, one was on a light-colored bike...." According to Detective Murphy, the individual on the dark-colored bicycle matched the description of "the suspect in the robberies": "[b]lack male, dark-colored clothing, I could see cornrows on his head. I couldn't see his face."

Detective Murphy "called for a patrol officer who was in the area to go down and identify the subjects[.]" Through the live feed, the detective observed that, when Officer Michael Prout arrived on the scene, the man on the dark-colored bicycle "took off" and "ran off into the building straight ahead"; the man on the light-colored bicycle stood by his bicycle.

Officer Prout testified that he was on patrol duty on October 19, 2010, when he received a radio call from Detective Murphy asking him to go to the Marcs Court area to investigate two black males riding bicycles. He "knew of a robbery that happened the evening before" and had been "briefed in lineup as to the suspect's description": "a black male, ranging in six foot one to about six foot three in height. And his nickname was B[.]"

The officer drove to the Marcs Court area and, as he turned his marked police cruiser onto Marcs Court, he saw two men riding bicycles toward a nearby apartment building located at 9 Marcs Court, their backs to the cruiser. One of the men

was wearing "a white sweatshirt with red vertical lines, blue jeans," and the other was wearing "a black baseball cap, I think a dreadlock style haircut and a camouflaged jacket." As he approached, the man in the white sweatshirt, later identified as appellant, abandoned his bicycle, ran "with his back turned ... into the mouth" of 9 Marcs Court, and entered Apartment F. Officer Prout was "not sure" if the suspect saw him. The other man (later identified as Joshua Grier) "just stood there." He told Officer Prout that the man who ran away went by the nickname "B." [1] According to the officer, "as soon as Mr. Grier said that, alarms went off" and he radioed for backup, indicating that the "subject that ran into the building" matched the description from the briefing: "a black male fitting the height requirements, nickname of B."

Additional officers arrived, and a "p[e]r[i]meter" was set up "around the building." Detective Richard Truitt attempted to "make contact with the resident whoever was in apartment F ... to try to ... get into the apartment and ... identify the subject that just ran in." According to Officer Prout, Detective Truitt announced that he was a police officer and banged on the door to the apartment. Eventually, an "adult female came to the door" and indicated that her two children and appellant were in the apartment. She agreed to leave the apartment with her children and they were "escorted away." At that point, the group of officers "stood outside of the apartment and Detective Truitt continued to ask the person inside, [appellant], to come out for approximately 25/30 minutes."

Officer Prout testified that, "after the [SWAT] Access Team arrived, I believe [appellant] came out on his own accord and they were able to put him into custody." The officer also testified that "I believe the consent was given by the female" and the SWAT team "searched the apartment."

---

1. Later, during an interview at the police station, Mr. Grier also told Detective Murphy that he knew the man who ran off by the nickname "B."

Officer Jennifer Card testified that, on October 18, 2010, she was "called" to 9 Marcs Court, Apartment F, in Annapolis. There, she "spoke with" Sherry Brown, who indicated that she was the "leaseholder" of Apartment F and that "B" was in the apartment at that time. According to Officer Card, Ms. Brown consented to a search of the apartment and later, at the police station, Ms. Brown executed a consent to search form.

After the testimony, the prosecutor argued that there was probable cause to arrest appellant, and that appellant did not have standing to contest the search of Apartment F. As to the arrest, appellant's counsel responded that "I don't think that the information that [the police] were acting on even comes close to them having probable cause to arrest [appellant] for this situation." More specifically, counsel reasoned, *inter alia:* (1) the description of the suspect was "very vague"; (2) there was no indication that appellant had seen Officer Prout's cruiser when he fled ("So, at best, what we have is a guy with his back to the police officer, with absolutely no eye contact, who is running into an apartment."); and (3) there were no "exigent circumstances" justifying a "warrantless stop," such as "the exigency of a felony having been committed or a misdemeanor being committed in the officer's presence," or "hot pursuit" of a fleeing felon. Regarding the search of the apartment, appellant's counsel submitted that "the consent search, itself, is fruit of the poisonous tree" of an illegal arrest, and thus appellant did not "necessarily need[ ] standing" to challenge the search. "Because but for the arrest of [appellant], they would not have even attempted to have a consent search there."

The court found that "the police had ample evidence from which they could conclude that they had probable cause" to arrest appellant. The court reasoned: (1) "he meets the description in the same area of the robber who committed the robbery the day before"; (2) "[t]hey give not the most detailed description but they do say black male, they give a height, they say cornrows or dreadlocks"; (3) "[w]hy does someone throw [his] bike down, leave [his] bike there and take off

running?"; and (4) Mr. Grier indicated that the man who fled went by the nickname "B," "which is the same nickname that was given of the person who was involved in the robbery on the 18th."

The court also found that appellant lacked standing to "complain about the search of the apartment":

I don't see anything [in evidence] that tells me what was seized or where it was seized from.

It seems that [appellant's] argument [alludes] to the fact that those items were seized from the apartment and all I know is that the woman, Ms. Brown, is the leaseholder. There has been [no] evidence in the case that [appellant] is also a co-leaseholder.

So, I have no basis from which to conclude that he had the authority to consent or not consent to the search of the apartment. So, it appears that the evidence presented shows that he has no standing to contest the search of the apartment.

### Discussion

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), includes "two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause." *Payton v. New York,* 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

■ "The touchstone of the Fourth Amendment is reasonableness[.]" *United States v. Knights,* 534 U.S. 112, 118, 122

S.Ct. 587, 151 L.Ed.2d 497 (2001). With this in mind, the Supreme Court has consistently affirmed that searches and seizures "conducted outside the judicial process," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *i.e.,* without "a judicial warrant . . . issued by a neutral magistrate after finding probable cause," *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), are both "presumptively unreasonable," *Payton,* 445 U.S. at 586, 100 S.Ct. 1371, or *"per se* unreasonable under the Fourth Amendment[.]" *Katz,* 389 U.S. at 357, 88 S.Ct. 507.[2]

 But the warrant requirement is "subject . . . to a few specifically established and well-delineated exceptions." *Id.* In regard to *arrests,* the Court of Appeals has said that a police officer "possesses legal justification 'to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense.' " *Prince George's County v. Longtin,* 419 Md. 450, 506, 19 A.3d 859 (2011) (quoting *Ashton v. Brown,* 339 Md. 70, 120, 660 A.2d 447 (1995)) (emphasis removed). And § 2–202(c) of the Criminal Law Article states:

> A police officer without a warrant may arrest a person if the police officer has probable cause to believe that a felony has been committed or attempted and the person has committed or attempted to commit the felony whether or not in the presence or within the view of the police officer.

In regard to *searches of a residence,* another exception to the warrant requirement is the consent of the occupant of the property searched. *Nestor v. State,* 243 Md. 438, 443, 221 A.2d 364 (1966); *Georgia v. Randolph,* 547 U.S. 103, 106, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

---

**2.** Warrantless searches and seizures are *per se* unreasonable "only in the sense that the police must secure a warrant unless they can demonstrate that the case fits within one of a number of specific exceptions that the Court has fashioned." Debra Livingston, *Police, Community Caretaking, and the Fourth Amendment,* 1998 U Chi Legal F 261, 267 (1998).

On appeal, appellant contends that the circuit court "erred" in denying the motion to suppress. According to appellant:

- there was no probable cause to arrest him because (1) "[t]he State relied on evidence that [appellant] fit the description of a person who had committed robberies in the area"—a "[b]lack male, six foot, cornrows, dreads, and slight facial hair" who went by the nickname "B"—without "present[ing] any evidence about the source or sources of that description, the basis of the source's or sources' knowledge, or the veracity or reliability of the source or sources"; and (2) neither Officer Prout's observation of appellant running into the apartment building nor appellant's belated exit from Apartment F supports a finding of probable cause;

- the State "sandbagged" him with the standing issue "at the end of the hearing when the time for presenting evidence on the issue of standing had passed"; and

- the State did not meet its burden of "establish[ing] where in the apartment the incriminating evidence was found, and whether it was found in a common area in which Ms. Brown had actual or apparent authority to allow a search." [3]

The tree standing at the heart of appellant's "fruit of the poisonous tree" argument is the arrest; the consent search and thus the evidence recovered in that search are the "fruit."

---

**3.** At trial, Mary Pat Whiteley, an evidence technician for the Annapolis City Police Department, testified that she and Detective Truitt "searched each room" of Apartment F. She found "a backpack that was hanging on the closet door in the one bedroom," from which she recovered "items" located in the "small pocket." When presented with State's Exhibits 1A–F, which include pictures of a social security card, driver's license, and permanent resident card belonging to Mr. Ramirez (the victim of the October 18, 2010 robbery), Ms. Whiteley stated that those items were from "the small pocket of the book bag. . . ." Based on the State's exhibits and Ms. Whiteley's testimony, also recovered from Apartment F was a wallet containing bank cards, health cards, and a Maryland identification card—all bearing appellant's name. The identification card also lists appellant's address as 9 Marcs Court, Apartment F. Various pieces of mail addressed to appellant at 9 Marcs Court, Apartment F, were also recovered. According to Ms. Whiteley, "each item of identification was in a different room of . . . the apartment."

The State responds that many of these arguments are being "raised for the first time on appeal," and, therefore, have been "waived"; but, even if these arguments had been preserved, "the motions court properly denied [appellant's] motion to suppress evidence."

The Court of Appeals has explained appellate review of a motion to suppress and the concept of probable cause as follows:

Our review of a motion to suppress is limited to the record of the suppression hearing. We review the findings of fact for clear error and do not engage in *de novo* fact-finding. This Court will review *de novo* the question whether, based on the facts presented at the suppression hearing, probable cause existed to support a warrantless arrest. We consider the facts in the light most favorable to the State as the prevailing party and independently apply the law to those facts to determine if the evidence at issue was obtained in violation of the law.

\* \* \*

Probable cause is a nontechnical conception of a reasonable ground for belief of guilt. To determine whether probable cause exists, we consider the totality of the circumstances, in light of the facts found to be credible by the trial judge, factoring in the variables of the information leading to police action, the environment, the police purpose, and the suspect's conduct. Probable cause exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion.

*Haley v. State*, 398 Md. 106, 131–33, 919 A.2d 1200 (2007) (internal citations omitted). We review a circuit court's determination of standing for clear error. *See Joyner v. State*, 87

Md.App. 444, 451, 589 A.2d 1330 (1991) ("The circuit court's ruling on the standing issue is subject to the clearly erroneous standard of review.").

We are persuaded that there was probable cause to support appellant's warrantless arrest. When Officer Prout turned his marked police cruiser into Marcs Court, he observed a man abandon his bicycle and run away. Although it was undisputed that, as the officer approached, the man's back was to him, it was still reasonable to infer that the man was aware of Officer Prout's approach and fled to avoid the police, and that his flight indicated, in light of the recent robberies, consciousness of guilt—especially when, in his haste, he abandoned his bicycle and made no effort to retrieve it.

Officer Prout was also aware that the suspect from the October 19, 2010 robbery had been described as "a black male, ranging in six foot one to about six foot three in height" who went by the nickname "B." [4] According to the officer, the man who ran fit that physical description, and, when Mr. Grier, appellant's cycling companion, stated that the man who ran into the Apartment F went by the nickname "B," "alarms went off" because Officer Prout recognized "B" as "[t]he initial that was given in the previous lineup for the possible robbery suspect." [5]

Regarding the search of the apartment, we are not persuaded that appellant's arguments regarding being "sandbagged" on the standing issue and the location of the evidence within the apartment are properly before us on appeal. *See Johnson v. State,* 138 Md.App. 539, 560, 772 A.2d 1260 (2001) ("The failure to argue a particular theory in support of suppression constitutes a waiver of that argument on appeal."). In fact, not only did appellant not make these arguments during the hearing, but he specifically asserted that neither

---

**4.** Contrary to appellant's assertion, the State did present evidence of the sources of this description when Detective Murphy testified that it was the composite description provided by the robbery victims.

**5.** Ms. Brown also told Officer Card that "B" was in Apartment F.

issue was of consequence. His counsel stated that appellant did not "necessarily need[ ] standing" to challenge the search of the apartment and that "where specifically in the apartment the items were seized or taken from" does not "come[ ] into play."

That said, appellant would not prevail even if these arguments were properly preserved for our review. In regard to standing, appellant has not referred us to any supporting authority for his contention that the State must challenge standing "before or during the *evidentiary portion* of the hearing[.]" (Emphasis added). This Court has said that the "initial" burden is on the State to challenge standing, but "[i]f the prosecution does raise the challenge, however, by even the most informal of oral pleadings, it is then clear that the burden of proof is allocated to the defendant to show his standing." *Thompson v. State*, 62 Md.App. 190, 202–03, 488 A.2d 995 (1985) (quoting R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1983)). Moreover, after the State raised appellant's lack of standing to challenge the search of the apartment, appellant made no effort to rebut that argument or reopen the evidentiary portion of the hearing.

Regarding the location of the evidence and Ms. Brown's authority to consent to a search of Apartment F, both Officer Prout and Officer Card testified that Ms. Brown provided verbal consent at the scene to a police search of the apartment, and Officer Card testified that Ms. Brown, who identified herself as the "leaseholder," also executed a consent to search form later at the police station. Thus, and assuming, without deciding, that appellant was a "co-tenant" of Apartment F, we are persuaded that Ms. Brown had actual or common authority to consent to a search of the areas of the apartment where the "incriminating evidence" was found. *See Nestor v. State*, 243 Md. 438, 443, 221 A.2d 364 (1966) ("The rule is well established that one co-tenant may give consent to a search and the evidence there disclosed can be used against the other tenant whose permission to enter and search the

premises had not been elicited."); *State v. Miller,* 144 Md.App. 643, 650, 799 A.2d 462 (2002) ("In [*United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) ], a woman who shared a room with the defendant authorized a search that resulted in finding inculpatory evidence to be used against the defendant. The Court held that the woman possessed common authority through joint access or control of the room, and thus, her consent was not unreasonable and the evidence discovered was admissible against the defendant.").

In sum, even if appellant's arguments regarding standing had been properly preserved, we would hold that the motion to suppress was properly denied.

## ILLEGAL SENTENCE

### *Facts*

On April 28, 2011, appellant appeared before the court on a "plea hearing," and the following colloquy occurred:

[APPELLANT'S COUNSEL]: Your Honor, we are [here] for a plea hearing and my understanding of the plea agreement is as follows.... [Appellant] will enter a plea in K–10–2230 to Count 1, which is robbery. [Appellant] will also enter a plea to K–10–2231, Count 1, which is robbery.

Upon disposition in those two cases, the remaining counts in those two cases will be dismissed or nol-prossed....

What we agreed upon is that any sentence both active and suspended imposed in K–10–2230 and 2231 will be run *concurrent* to each other. The length of active incarceration, the length of suspended sentence, any probation supervised, unsupervised terms or such, we are essentially free to argue for and it is up to you to impose.

THE COURT: Okay.

(Emphasis added). The court accepted the plea.

In Case No. K–10–2231, appellant was sentenced to fifteen years incarceration (five years suspended) and five years probation. In Case No. K–10–2230, appellant was sentenced to fifteen years incarceration (all fifteen years suspended) and

five years probation. At the sentencing hearing, the court stated that, "in the event of a violation of probation," the fifteen suspended years in Case No. K–10–2230 would be "served *consecutive*" to the five suspended years in Case K–10–2231. (Emphasis added).[6] "So, essentially, there is an additional 20 years that will be potential incarceration if [appellant] were to violate probation."

## Discussion

According to appellant, by imposing a *consecutive* suspended sentence in Case No. K–10–2230, the court violated the plea agreement's call for *concurrent* sentences and entered an "illegal sentence." In the State's view, "[t]he court properly exercised its discretion under law and by agreement with the parties, to impose that appropriate term and sanction on probation in the event [appellant] violated his probation." Whether a trial court has violated the terms of a plea agreement is a question of law which we review *de novo*. *Cuffley v. State*, 416 Md. 568, 581, 7 A.3d 557 (2010).

Section 6–224 of the Criminal Procedure Article states, in pertinent part:

(b) *Sentencing by presiding judge of circuit court.*—If a defendant is brought before a circuit court to be sentenced on the original charge or for violating a condition of probation, and the judge then presiding finds that the defendant violated a condition of probation, the judge:

(1) may sentence the defendant to:

(i) all or any part of the period of imprisonment imposed in the original sentence; or

(ii) any sentence allowed by law, if a sentence was not imposed before[.]

*Nguyen v. State*, 189 Md.App. 501, 985 A.2d 87 (2009) is instructive. In that case, Nguyen was sentenced to 365 days incarceration (277 days suspended) for a sexual offense, 18

---

**6.** The docket entry reflects that "consecutive" sentences would be imposed if probation were violated.

months incarceration for assault, and three years probation. Although some conditions were placed on Nguyen's probation, the court specifically stated at the sentencing hearing that it was *not* requiring him to register as a sex offender. Later, at a violation of probation hearing, Nguyen was ordered to serve the remaining portion of his sentence and to register as a sex offender. On appeal, he argued that the trial court had exceeded its authority by ordering him to register as a sex offender. We agreed that, because the original sentence did not require Nguyen to register as a sex offender, the court could not impose that requirement for the first time as a consequence of his failure to abide by the terms of his probation.

Here, there is no dispute that, under the terms of the plea agreement, any sentences imposed in cases K–10–2230 and K–10–2231 were to run concurrent to each other. While the circuit court did not actually impose a consecutive sentence, we are persuaded that, were it to be imposed—as indicated it would be in the event of a violation of probation—that sentence would be in violation of the plea agreement. Neither § 6–224(b) of the Criminal Procedure Article nor the plea agreement itself authorizes a change in the sentence from concurrent to consecutive upon appellant's failure to abide by the terms of his probation. Therefore, that aspect of the sentence must be vacated.

## SUFFICIENCY OF THE EVIDENCE

### *Facts*

At appellant's trial in case No. K–10–2131, Vincente Ramirez testified that, on October 18, 2010, while standing outside the Ashton Apartments on Ashton Court in Annapolis smoking a cigarette, he observed a young, black man going by on a bicycle. The young man parked "the bicycle at the corner of the building and then he came up in front of me and stuck a gun, like a pistol . . . right in my face." Mr. Ramirez wanted to run to try to get into the apartment, but, according to Mr. Ramirez, appellant

blocked the stairway and got even closer to me with the pistol. That was when I took my arm and ... slammed it up against his hand that had the gun and that's when I realized the gun was fake and then I wasn't afraid of him anymore and that's when I took him on.

\* \* \*

As soon as I grabbed his hand like this, his hand hit against the wall. And that's when I heard the noise of the gun and realized it wasn't made of metal. That's when I realized that this gun wasn't going to do me any harm. And then while I had his hand up like this with the gun in the hand that's when he reached down with his other hand and grabbed my phone.

\* \* \*

I started fighting with him. He got me ... in a headlock trying to bend my head over. That's when I was able to bite him and I bit him in the chest [and on the hand].

\* \* \*

He cornered me. And then my wife came out and she grabbed him by the sweater. And she called my daughter and my daughter came out and then he took off running, but he was able to get my wallet out of my pants, so he took off with my wallet.

Ramirez's wallet contained his residency card, driver's license, social security card, credit cards, a national identification card from El Salvador, a card with personal phone numbers written on it, and currency consisting of 26 El Salvadoran colons.[7]

At the end of the State's case, appellant's counsel made a motion for judgment of acquittal. As to the reckless endangerment charge, the following exchange occurred:

[APPELLANT'S COUNSEL]: I don't think that the State proved that [there was] a substantial risk of death or serious physical injury to Mr. Ramirez.

---

7. 26 colons is worth approximately $3.00.

I think what we have in the best case scenario is a person ... grabs Mr. Ramirez, they struggle. Mr. Ramirez realizes that a gun that has been pointed at him is not a real gun. He identifies it as such when it is hit against the wall and he hears a plastic sound. At that point he testifies himself that he doesn't become afraid and struggles further with him.

I don't believe that there was any risk of death based upon the mere struggle. I don't believe there was any risk of serious physical injury based upon the struggle. So I would ask for acquittal in that.

THE COURT: What is your response from the State?

[PROSECUTOR]: Your Honor, certainly there was some weapon that was used whether it was an actual working handgun or not. ...

Certainly it is not just a handgun that can cause serious physical injury. Someone—the right person with the right instrument in their hand, the heavy object, could cause a significant amount of damage to someone.

You saw Mr. Ramirez, he is small in stature. Certainly a lot smaller than [appellant]. Just because ... Mr. Ramirez was eventually able to fight [appellant] off, mind you, by biting him, it was a fairly extreme response.

The Court denied the motion.[8]

During closing arguments, the prosecutor did not address the reckless endangerment charge, but stated, regarding the

---

8. As to the motion for judgment of acquittal on the armed robbery count, which the court also denied, the following exchange occurred:

[APPELLANT'S COUNSEL]: I think [Mr. Ramirez] said that he knew that the gun was not real. He believed the gun to be a plastic gun. ... [A] toy gun made of plastic isn't enough to prove the element of a deadly weapon in terms of robbery with a deadly weapon. ... The COURT: What do you say to that?

[PROSECUTOR]: Your Honor, again we don't know what type of weapon it was. It is Mr. Ramirez's opinion that it is perhaps a toy gun; however, there has been no foundation that he is an expert in

armed robbery charge: "if you find that the weapon that was used in this case could have been something that could have made a serious bodily injury, you could find that [appellant] committed the armed robbery."[9] In response to that argument, appellant's counsel stated:

> any way in any sort of firearms or anything. We don't know if he was just lucky that day.
>
> \*　　\*　　\*
>
> THE COURT: What evidence is there from the State that there was a deadly weapon?
>
> [PROSECUTOR]: Well we have an object in his hand that he is using to rob this individual. Certainly there are cases that say that deadly weapons are not just guns and knives, they could be a bludgeoning instrument.
>
> And certainly someone could take in the right hands—you know, a heavy plastic object like this could cause significant damage to someone, serious bodily injury to someone.
>
> You know, that it didn't in this case ... is not the test. But certainly I think [appellant's] size, if he wielded it in a particular way—it certainly—you know, there have been people who have died over one punch. This person—
>
> THE COURT: Well let me ask you this. What about the fact that it is a plastic gun[?]
>
> [PROSECUTOR]: Well what I'm saying is we don't know it is a plastic gun. . . . The witness testified that it sounded like it was plastic and he believed that it was possibly plastic. But again he has not been offered as an expert in any sort of firearms.
>
> This is an opinion of a guy in the moment of this struggle. We have absolutely no idea if it is in fact plastic or if it is in fact non-working.
>
> So it could have been in fact a BB gun for all we know, which could have caused serious injury, you know, had it been shot. You know, plenty of BB guns are made of plastic. So we don't know that it is not operable. Certainly that wouldn't be a handgun, but a BB gun could cause serious physical injury.
>
> So, you know, I think that is up to the jury to decide, you know, whether or not they think this object could cause serious injury, but I don't think at this point—either there is nothing to say that Mr. Ramirez is an expert or saw it—it is just his opinion that it is made of plastic.
>
> THE COURT: He said it was—he thought that it was plastic. . . . Certainly it could have been a plastic BB gun. That could certainly shoot your eye out or cause another serious injury[.]

**9.** We note that in *Wright v. State*, 72 Md.App. 215, 528 A.2d 498 (1987), we held that a "[p]lastic toy pistol," which the victim did not believe was real and which did not "intimidate[ ]" her, was not a "dangerous

[T]here is absolutely no evidence that [the plastic gun] has the capability to cause death or serious bodily harm. That is what the State has to prove, that this weapon had the capability of causing death or serious bodily harm, and that wasn't proven. . . . There is absolutely no proof that the State put on that there was any substantial risk of death or serious physical injury.

The prosecutor, in rebuttal, stated:

Now, [appellant] also mentions that . . . Mr. Ramirez wasn't scared at some point. He said he felt that [the gun] . . . was plastic, and all of a sudden he is not scared.

Well ladies and gentlemen, that doesn't mean that he shouldn't have been scared. You know, not everybody reacts the same way. And there are certainly circumstances where someone probably should be scared and maybe those impulses don't pick up.

So when he said at that point he wasn't scared, implying that at some other point he was scared. And certainly he felt that it was plastic, but he didn't say I thought it was a toy.

* * *

Well it doesn't mean that . . . he shouldn't have been scared and it doesn't mean that something bad, you know, worse than what happened could have happened. That doesn't mean that, you know, it is not a crime.

The jury convicted appellant of, *inter alia*, reckless endangerment relating to Mr. Ramirez.

### Discussion

 Appellant contends that the evidence was not sufficient to support his conviction for reckless endangerment.[10]

---

and deadly weapon" for the purposes of a charge of robbery with a deadly weapon. *Id.* at 216, 528 A.2d 498.

10. The State does not argue that the merger by the trial court of appellant's conviction for reckless endangerment into his conviction for robbery renders his sufficiency argument moot. We note that merger

More specifically, he argues that, because Mr. Ramirez believed the gun was "fake," there was no "serious risk of death or serious injury." The State replies that "[i]t matters not that Mr. Ramirez may have thought that the gun was not real or that he did not feel that he was in danger" because "the jury could have concluded, in the light most favorable to the State, that Mr. Ramirez may have been mistaken that the gun posed no risk[.]" [11]

In considering a challenge to the sufficiency of the evidence, we view the evidence, and all inferences fairly deducible from the evidence, in the light most favorable to the prevailing party; in this case, the State. *Hackley v. State,* 389 Md. 387, 389, 885 A.2d 816 (2005). The Court of Appeals has said:

> In reviewing the sufficiency of the evidence presented on the charges of ... reckless endangerment, we emphasize that we are not sitting as the trier of fact and, therefore, we are not to ask ourselves whether *we* would convict based upon the evidence presented.... [W]e are asked only to determine whether *any* rational trier of fact could have found [the defendant] guilty of the crimes charged based upon the evidence presented at trial.

*State v. Albrecht,* 336 Md. 475, 502, 649 A.2d 336 (1994). We may only sustain the jury's findings "if the circumstances, taken together, do not require the trier of facts to resort to speculation or conjecture." *Brown v. State,* 182 Md.App. 138, 157, 957 A.2d 654 (2008).

---

for sentencing purposes does not vacate the conviction, only the sentence. *See generally Moore v. State,* 198 Md.App. 655, 18 A.3d 981 (2011). Because the issue has not been raised, we will not address it *sua sponte. See Sanchez v. Potomac Abatement, Inc.,* 198 Md.App. 436, 439, 18 A.3d 100 (2011) (mootness raised by appellate court *sua sponte* ).

**11.** Although the focus on appeal is the authenticity and/or operability of the gun, at trial, both the prosecutor ("Someone—the right person with the right instrument in their hand, the heavy object, could cause a significant amount of damage to someone.") and appellant's counsel ("I don't believe there was any risk of serious physical injury based upon the struggle.") addressed reckless endangerment in terms of the gun also being used as a bludgeoning instrument.

Section 3–204(a)(1) of the Criminal Law Article states that "[a] person may not recklessly . . . engage in conduct that creates a substantial risk of death or serious physical injury to another[.]" [12] And § 3–201(d) states:

"Serious physical injury" means physical injury that:

(1) creates a substantial risk of death; or

(2) causes permanent or protracted serious:

 (i) disfigurement;

 (ii) loss of the function of any bodily member or organ; or

 (iii) impairment of the function of any bodily member or organ.

 The reckless endangerment statute "is aimed at deterring the commission of potentially harmful conduct before an injury or death occurs. As a consequence, a defendant may be guilty of reckless endangerment even where he has caused no injury." *Albrecht,* 336 Md. at 500–01, 649 A.2d 336. Reckless endangerment "is an inchoate crime and is intended to deal with the situation in which a victim is put at substantial risk of death or serious bodily harm but may, through a stroke of good fortune, be spared the consummated harm itself." *Albrecht v. State,* 105 Md.App. 45, 58, 658 A.2d 1122 (1995).

 The Court of Appeals has stated:

The elements of a prima facie case of reckless endangerment are: 1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly.

*Jones v. State,* 357 Md. 408, 427, 745 A.2d 396 (2000). Put another way,

[t]he test . . . is whether a [defendant's] misconduct, viewed objectively, was so reckless as to constitute a gross depar-

---

12. Reckless endangerment was not a crime at common law. *Jones v. State,* 357 Md. 408, 426, 745 A.2d 396 (2000).

ture from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish.

*State v. Pagotto,* 361 Md. 528, 549, 762 A.2d 97 (2000) (quoting *Minor v. State,* 326 Md. 436, 443, 605 A.2d 138 (1992)).

Although the State challenges Mr. Ramirez's testimony that the gun was "fake," his testimony was the only evidence presented by either side regarding the authenticity and/or operability of the gun. The State failed to counter Mr. Ramirez's testimony with any evidence from which a juror might rationally infer that the gun was real and capable of firing a projectile, or if used as a club, would present a substantial risk of death or serious personal injury. The question then is whether wielding a "fake," "toy," or "plastic" gun under the circumstances of this case could satisfy the necessary elements of reckless endangerment.

In 1989, the General Assembly passed H.B. 1448, which became Maryland's reckless endangerment statute. Although H.B. 1448 has a "sparse legislative history," *Minor,* 326 Md. at 442, 605 A.2d 138, documents in the legislative history file of the bill reveal a particular concern for the reckless discharge of *firearms.* *See* Senate Judicial Proceedings Committee Floor Report on H.B. 1448 (1989) ("This bill prohibits conduct which, while not criminal under current law, creates a substantial risk that a criminal act will result. According to testimony, individuals who recklessly shoot *firearms* without criminal intent near roads or buildings cannot be prosecuted under current law."); Maryland Department of Public Safety and Correctional Services, Position on Proposed Legislation (February 27, 1989) ("As applied to a criminal violation, reckless endangerment would be particularly useful in charging and prosecuting the miscreant who demonstrates a total neglect for the welfare and safety of bystanders during his criminal behavior, *i.e., firing a weapon* while in a populated area.") (emphasis added). This Court has said that the reckless endangerment statute "is modeled on § 211.2 of the Model Penal Code," *Albrecht,* 105 Md.App. at 83, 658 A.2d 1122, which states that "[r]ecklessness and danger shall be pre-

sumed where a person knowingly points *a firearm* at or in the direction of another[.]" (Emphasis added).

We have not found a Maryland case directly addressing whether brandishing and pointing a fake or inoperable firearm at another creates "a substantial risk of death or serious physical injury" within the meaning of reckless endangerment statute. Several Maryland cases, however, are instructive, and lead us to conclude that brandishing and threatening another with a fake gun incapable of firing does not, under the circumstances of this case, satisfy the risk element of reckless endangerment.[13]

In *Wieland v. State,* 101 Md.App. 1, 643 A.2d 446 (1994), the defendant was convicted of reckless endangerment for brandishing a handgun while drunk and accidentally shooting his brother. This Court held that the evidence was sufficient to support that conviction:

> "In terms of *corpus delicti,* deliberately firing a bullet into the torso of another person could be deemed to create 'a substantial risk of death or serious physical injury to another person.' At a lesser, but still sufficient, level of risk, even brandishing a *loaded* and cocked weapon, particularly when in shaky control of one's own motor skills, could be deemed conduct that creates a substantial risk of death or serious physical injury to another person."

*Id.* at 28, 643 A.2d 446 (emphasis added).

In *Minor,* 326 Md. 436, 605 A.2d 138, the defendant was convicted of reckless endangerment for handing his brother, with whom he had been drinking alcohol throughout the day, a *loaded* shotgun and daring him to play "Russian roulette." The brother took the weapon and shot himself to death. The

---

**13.** Although § 211.2 of the Model Penal Code states that "[r]ecklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, *whether or not the actor believed the firearm to be loaded,*" (emphasis added), "results in unloaded gun cases of reckless or wanton endangerment are about evenly divided, depending largely on whether, in the particular circumstances, the defendant's conduct was likely to cause a dangerous reaction by the victim or others." 68 A.L.R.4th 507.

Court of Appeals held that the evidence was sufficient to show that the appellant both acted recklessly and created a substantial risk of harm.

*State v. Albrecht,* 336 Md. 475, 649 A.2d 336 (1994), which primarily addressed the recklessness element of the offense rather than the substantial risk component, is nevertheless relevant to our discussion. In *Albrecht,* the Court of Appeals affirmed a Montgomery County police officer's convictions of involuntary manslaughter and reckless endangerment, stemming from an incident during which the shotgun he was pointing at a female suspect accidentally discharged, killing the woman. Addressing Albrecht's contention that he acted reasonably under the circumstances, the Court identified the following factors that supported its conclusion that the evidence was sufficient to sustain the convictions:

> The State adduced sufficient testimony from which the trial court could have concluded that a reasonable Montgomery County police officer would not have acted as Albrecht did on this occasion, in drawing and *racking*[14] a shotgun fitted with a bandolier and bringing it to bear, with his finger on the trigger, on an unarmed individual who did not present a threat to the officer or to any third parties, in a situation where nearby bystanders were exposed to danger.... We therefore cannot, as a matter of law, find that trial judge erred in concluding that Albrecht's actions, in their totality, were both reckless and grossly negligent.

*Id.* at 505, 649 A.2d 336 (emphasis added).

These cases hold that the risk of death or injury created in recklessly handling a loaded, operable firearm is that the weapon may discharge. Here, there is no evidence that the alleged weapon was either operable as a firearm or substantial enough to use as a bludgeoning instrument. Thus, there is no evidence to support a finding that appellant created a "substantial risk of death or serious physical injury to another."

---

14. "The term 'racking' refers to the manual chambering of a round into the shotgun's barrel." 336 Md. at 481 n. 2, 649 A.2d 336.

JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND RE-VERSED IN PART. COSTS TO BE PAID BY 1/3 BY APPELLANT AND 2/3 BY ANNE ARUNDEL COUNTY.