*Richard W. Williams v. State of Maryland*, No. 858, September Term, 2019. Opinion by Nazarian, J.

**CRIMINAL LAW – FOURTH AMENDMENT – *TERRY* FRISK**

State violated criminal defendant's Fourth Amendment rights when police officer performed a take down without testifying that defendant was armed and dangerous, at risk of flight, or a threat to the officer's safety.

**CRIMINAL LAW – FOURTH AMENDMENT – ARREST**

Defendant was placed under arrest when he was tackled, wrestled to the ground, told to put his hands behind his back, and pepper sprayed. The arrest was not supported by probable cause because there was no evidence to warrant a prudent person in believing that the defendant had committed or was committing a criminal offense at the time of the arrest, and evidence gathered after the unlawful arrest should have been suppressed as fruits of the poisonous tree.

**CRIMINAL LAW – RESISTING ARREST**

Evidence was insufficient to convict criminal defendant of resisting arrest where arrest was unlawful.

**CRIMINAL LAW – JURY SELECTION – RIGHT TO FAIR AND IMPARTIAL JURY**

Trial court's jury selection method, which involved eliminating all potential jurors who responded to a *voir dire* question, did not violate defendant's right to a fair and impartial jury where defendant was unable to show that a cognizable group was excluded from the jury panel. Even so, the method risks improperly excluding categories of jurors, and the marginal gains in judicial efficiency are not worth the risk.

Circuit Court for Worcester County
Case No. C-23-CR-18-423

_____

RICHARD W. WILLIAMS

v.

STATE OF MARYLAND
_____

Nazarian,
Leahy,
Friedman,

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: May 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Richard Williams was pulled over by Sergeant Rudell Brown, a police officer in Pocomoke City, Maryland, for talking on his cell phone while driving. When Mr. Williams stopped his car, both he and Sergeant Brown got out of their vehicles. Sergeant Brown approached Mr. Williams quickly from behind and took him down to the ground. While Mr. Williams was handcuffed, Sergeant Brown discovered three baggies of marijuana, all (and collectively) non-criminal in amount, and $443 in cash on and about Mr. Williams's person. Sergeant Brown then searched his car and found a scale and a criminal amount of marijuana.

Mr. Williams was charged and convicted of possession with intent to distribute marijuana, possession of marijuana, resisting arrest, and driving on a suspended license. He argues on appeal that the trial court violated his constitutional right to a fair and impartial jury because its method of selecting the jury excluded significant parts of the community. Mr. Williams contends that Sergeant Brown violated his Fourth Amendment right against unlawful searches and seizures when he arrested him without a warrant. And he argues that the evidence was insufficient to support his conviction for resisting arrest. We hold that Mr. Williams's Fourth Amendment rights were violated by an illegal arrest and search and that the evidence could not support his conviction for resisting arrest, and we reverse the judgments for possession with intent to distribute marijuana, possession of marijuana, and resisting arrest. We affirm his conviction for driving on a suspending license. We observe as well that the method used to select the jury in this case risks excluding members of the venire in ways the Constitution forbids and, as a result, seems to undermine the judicial economy objectives it seeks to achieve.

# I.        BACKGROUND

## A.        The Suppression Hearing

On April 2, 2019, the circuit court held a hearing to resolve pending motions, including a defense motion to "suppress evidence that was recovered . . . from a search of a vehicle subsequent to a traffic stop," arguing that it was "sort of a warrantless search" and for a ruling that the State had the "burden of showing that [the search] fits into one of the established exceptions to the warrant requirement."

Sergeant Brown was the sole witness for the state. He testified he was on patrol on October 20, 2018, in an unmarked vehicle at the intersection of Linden Avenue and 6th Street in Pocomoke City. Sergeant Brown saw Mr. Williams driving westbound on Linden and turn left onto 6th Street with "his cell phone up to his ear," so he turned his car around on 6th Street and initiated a traffic stop.

The Sergeant's testimony on the mechanics of this traffic stop vacillated. He stated on direct that Mr. Williams pulled over "[a] short time later," after taking a right onto Bank Street, which is a block away from the 6th Street/Linden Avenue intersection. But he indicated later that it took Mr. Williams "two to five minutes" to stop after he turned on his emergency equipment. On cross-examination, he testified that he didn't turn his emergency signal on until both he and Mr. Williams were on Bank Street, where Mr. Williams stopped his car on the edge of another individual's property. He did not clarify how it took him "two to five minutes" to stop Mr. Williams after they turned onto Bank Street, which only

stretches a few blocks in that direction.[1]

Regardless, as Sergeant Brown got out of his car, he noticed Mr. Williams "quickly [getting] out of his vehicle" without being instructed to do so. Sergeant Brown stated on direct that he "approached [Mr. Williams] quickly as he got out" and observed that Mr. Williams had his back to him and that he "held something in his hands" that were "clenched" together. On cross, he indicated that he "didn't see anything in [Mr. Williams's] hands" and that "normal people don't jump out of their car" during routine traffic stops.

Sergeant Brown didn't identify himself as an officer, but he was in uniform. He "grabbed" Mr. Williams, he said, because he "didn't know what he had in his hands." Then Sergeant Brown wrestled Mr. Williams to the ground, "told him to put his hands behind his back" and to "stop resisting," and pepper sprayed him. After being pepper sprayed, Mr. Williams complied and quit struggling or resisting. He then threw "two bags of marijuana underneath the car" and Sergeant Brown "eventually" placed him in handcuffs.

Sergeant Brown's testimony on the order in which he searched Mr. Williams's person and car wasn't clear:

> [THE STATE]: After Mr. Williams was in handcuffs, what did you do?
>
> [SERGEANT BROWN]: I'm not quite sure I understand you.
>
> [THE STATE]: Well, after – so you put Mr. Williams in handcuffs. You recovered these two bags.
>
> [SERGEANT BROWN]: Back up shortly after arrived [*sic*] during that time. I ended up searching the vehicle.
>
> [THE STATE]: Okay. Well did you ever search Mr.

---

[1] Sergeant Brown testified further that the police report stated incorrectly that Mr. Williams turned onto Oxford Street, which is an additional block away from Linden Avenue.

Williams's person?

[SERGEANT BROWN]: Yes, I did.

[THE STATE]: Okay. And what other – what, if anything, did you observe or did you find on Mr. Williams's person?

\*\*\*

[SERGEANT BROWN]: He had marijuana in his left jacket pocket.

[THE STATE]: And where was that?

[SERGEANT BROWN]: In his left jacket pocket.

[THE STATE]: Oh, okay. Was it loose? Was it – how was it contained if it was?

[SERGEANT BROWN]: In a plastic bag.

[THE STATE]: Okay. Did you find anything else on his person at that time?

[SERGEANT BROWN]: $443 in his right pants pocket.

Nonetheless, Sergeant Brown testified on cross that the two baggies of marijuana tossed under the car and the baggie recovered from Mr. Williams's jacket pocket were not criminal in quantity. After Mr. Williams was handcuffed, and "obviously not free to leave," Sergeant Brown searched the car and found a "large amount" of "plastic baggies" in the center console, a cell phone, and a larger, criminal quantity of marijuana and a scale in the trunk of the car. Sergeant Brown later towed the vehicle "for safekeeping" without allowing Mr. Williams to try to contact a licensed driver to move the car.

The State argued that Sergeant Brown was "okay with putting his hands first on Mr. Williams and then placing him in handcuffs" and relied "upon either the risk of flight or danger to the police officer." The prosecutor stated that Sergeant Brown "definitely had probable cause" to search the car because of the recovery of the three baggies of marijuana and because Mr. Williams had been observed exiting the car. Alternatively, the State

4

argued that the evidence would have been found under the inevitable discovery doctrine because the car was towed. Defense counsel argued that the detention and use of handcuffs moved the search from a "Terry-style limited detention or your routine traffic stop into arrest . . . conducted without probable cause." And defense counsel responded that the State failed to meet the threshold showing necessary to invoke the inevitable discovery doctrine.

The suppression court first made findings of fact about the pursuit and searches:

> Well, the facts as the Court finds in this matter for purposes of this motions hearing are that: The police officer is on patrol. He sees [Mr. Williams] operating a motor vehicle. He's got a cell phone to his ear, apparently using this cell phone to communicate, in violation of Maryland law.
>
> The police officer, driving in an unmarked vehicle, but nonetheless has emergency lighting and all that sort of thing, activates his lights, turns around, activates his lights [*sic*], follows [Mr. Williams]. [Mr. Williams] makes a turn, as the police officer describes, pulls up into the yard, he said, of a vehicle – of a house alongside the roadway, immediately jumps out of the vehicle, that is [Mr. Williams], before the police officer can even get out of his vehicle, turns away so that the police officer can't see his front or what he has in his hand.
>
> The police officer observes that [Mr. Williams] has something in his hand. The police officer approaches him quickly, grabs ahold of him, tries to get him to turn around. He doesn't turn around. They end up wrestling. The police officer tells him to stop resisting. Tells him to put his hands behind his back. [Mr. Williams] does not, continues to struggle.
>
> Some time during the course of this, [Mr. Williams] discards, throws away, two bags, which the police officer believes contain marijuana based on his experience, discards them, if you will, under the vehicle.
>
> The police officer manages to control [Mr. Williams], cuffs him, searches him. First of all, he recovers the two bags that [Mr. Williams] has discarded immediately after getting out of

the vehicle and discarded under the vehicle, confirms that the contents of those bags are, based on his experience, marijuana.

Back-up arrives. He searches [Mr. Williams], finds a significant quantity of money and more marijuana in [Mr. Williams's] jacket. He then searches the interior of the vehicle.

The suppression court ruled that Sergeant Brown had probable cause to search the car because there were baggies in the center console:

So the question is, does he have probable cause to believe that there's an additional quantity of marijuana in the vehicle? The Court finds that under all the circumstances that he does have probable cause to search the interior of the vehicle. He searches the interior of the vehicle. Among other things, he finds a number of plastic bags in the center console, additional evidence, if you would, that would cause a reasonable police officer to suspect that there's additional marijuana in the vehicle. He continues to search, searches the trunk, finds another quantity of marijuana in the trunk and finds a scale in the trunk. Thereupon, [Mr. Williams] is [] restrained already—is arrested and presumably taken to the police department or whatever for processing.

The court went on to find that even if the search was bad, the doctrine of inevitable discovery applied:

And the doctrine of inevitable discovery applies, it seems to me. If there was something wrong, if there wasn't probable cause to conduct a search, then the police officer's right to seize the vehicle under the circumstances, have it towed, conduct an inventory as he's required to do, is something that would have happened anyway.

## B.    Jury Selection

Before selecting the jury for this case, the trial court described for the panel the method it used to select jurors:

[I] have prepared—after reviewing the request of the State and

the defense, I've prepared the voir dire questions that I will propose or propound on the venire panel . . . . Those questions have been enumerated. What I plan on doing is asking all of the enumerated questions one through 15 of the jury panel, noting any responses by the prospective jurors.

[T]he Court intends on seating one alternate which means that we need 24 qualified jurors or jurors who don't have a bias, that they can be fair and impartial.

It is my intent that if a review of the venire panel following asking all of the questions, **if there are 24 jurors who have not responded affirmatively or negatively which means that they have not identified a potential bias and have through their inaction or their lack of being responsive to any of the questions, they have identified themselves as individuals who can be fair and impartial if seated as a juror, then my intent is to begin the selection of those jurors** that would preside over Mr. Williams' case from those individuals, meaning people who answer yes or no to a question, their numbers will not be called provided that we have 24 jurors who are fair and impartial and have not identified any bias.

(emphasis added). Defense counsel objected to the court's method and argued that it would deprive individuals in the venire of their right to sit on a jury and Mr. Williams of his right to an impartial jury:

Jury service, particularly from our perspective, is often thought of as a right that inures to the benefit of the defendant a fair and impartial jury selected from your peers in the community. . . .

I think that there's an aspect from which jury service is actually a right that also inures to the benefit of the jury venire itself. The right of women to serve on juries has been something that had been long fought over in the 20th century and hard won. **And I think that the proposed method by the way the Court suggests we proceed is in some senses equivalent to disqualifying jurors who would otherwise be qualified.**

(emphasis added).

Defense counsel responded that typically, a *voir dire* question is asked, and if

7

anyone in the venire "answers yes," they would be questioned by the court individually. Counsel argued that the court's approach would exclude individuals who "would otherwise be able to be fair and impartial" in a way that violated their right to serve on a jury. The defense posited that "a fair and diverse jury would include individuals who have varying views about various crimes, varying thoughts [and] strong feelings about certain things, various knowledge of other elements of the trial process," and that "Mr. Williams would have a right to have individuals like that" be considered for his jury.

The trial court treated the defense's objection as a motion and denied it, indicating that its method of jury selection doesn't violate the individual jurors' right to sit on a jury or Mr. Williams's right to a fair and impartial jury:

> The purpose [of voir dire] is, number one, an examination to determine whether prospective jurors meet minimum statutory qualifications for jury services. Those questions were all propounded to the panel during their application process . . . . Purpose two is an examination to discover the juror's state of mind as to the matter at hand or any collateral matters reasonably liable to have undue influence over him or her. The purpose is not [] to find out as much as you can about a person so that you can then decide whether or not you want them on your jury. . . . In Maryland the purpose is only to identify potential biases and those things that might influence a person [] to determine whether they can be in fact fair and impartial.

The court explained that any potential juror who responded affirmatively to a question would have a higher chance to have a "potential bias," and by selecting jurors solely from the pool of people who had not responded to any *voir dire* question, the court would "provide[] Mr. Williams the fairest and the most impartial jury pool possible . . . ." Finally, the court stated that it was exercising "judicial discretion in how and in what order

8

these names are called" and that this method was "one of the identified methods of selection" identified in the Maryland State Bar Association's Special Committee on Voir Dire 2015-2016 report. The court indicated that it wasn't, in its view, disqualifying prospective jurors so much as reordering them:

> I don't consider—I think [the record] needs to be clear. I don't consider this process to result in a determination that jurors are disqualified. Disqualified would be an identification of a bias that they do not satisfactorily answer relieving any concern about bias that results in someone being stricken for cause. They then become disqualified, not qualified to serve.
>
> Individuals who answer affirmatively or negatively to any of these questions, they remain qualified until such time as they are unqualified. I am simply choosing to select jurors for consideration in an order that I believe is efficient and effective and results in the fairest possible jury or venire panel for Mr. Williams or any defendant.

As a result of the trial court's method, the following members of the venire responded affirmatively to the affiliated *voir dire* question:

| Question | Juror Numbers |
| --- | --- |
| "[D]o you know any of those witnesses [Sergeant Rudell Brown, Corporal Rodney Wells, or Jessica Taylor] in any capacity?" T6/11 22. | 139, 185 |
| "Would you give any greater or lesser credit or weight to the testimony of a police officer over that of a witness in another occupation merely because of his or her status as a police officer? Greater or lesser credit or weight to a member of law enforcement." T6/11 23. | 108, 127 |
| "Have any of you or any member of your immediate family, immediate family is defined as your parents, your children, your siblings or spouses of siblings. Have any of you or any members of your immediate family ever been the victim . . . . of a crime similar to the crimes charged, a witness to a crime similar to the crimes charged or arrested for, charged with or convicted of a crime similar to the crimes charged?" T6/11 24 | 223, 148, 227, 163, 127*, 160, 494, 484, 183, 131, 154, 215, 126, 110, 139*, 257, 185*, 175 |
| "Have any of you ever been a member of a law enforcement | 206 |

| agency?" T6/11 26. | |

\* Responded to a previous question

Two jurors were excused in response to the witness question, two were excused in response to the police credibility question, eighteen jurors were excused in response to the crime victim/crime witness/crime charged question (including one juror, Juror 127, who responded affirmatively to the police credibility question and two jurors, Juror 139 and Juror 185, who had responded to the witness question), and one juror was excused in response to the member of law enforcement question, for a total of twenty excluded potential jurors.

## II.     DISCUSSION

Mr. Williams raises three questions on appeal that we rephrase and reorder.[2] *First*, did the suppression court err when it denied Mr. Williams's motion to suppress evidence

---

[2] Mr. Williams raised three Questions Presented:

> 1. Did the trial court err by using a method of jury selection that excluded significant parts of the community from the jury without a finding of bias?
>
> 2. Did the suppression court err in failing to suppress evidence discovered during a search of Mr. Williams' vehicle?
>
> 3. Was the evidence insufficient to convict Mr. Williams of resisting arrest?

The State rephrased those Questions Presented as:

> 1. Did the trial court properly conduct jury selection?
>
> 2. Did the trial court properly deny Williams's motion to suppress the evidence recovered from his vehicle?
>
> 3. Was the evidence sufficient to convict Williams of resisting arrest?

of marijuana on Mr. Williams's person and in his car? *Second*, was the evidence sufficient for a jury to find Mr. Williams guilty of resisting arrest? *And third*, did the trial court err during jury selection when it selected a jury from a pool in the venire that did not respond affirmatively or negatively to *voir dire*?

### A. Mr. Williams's Fourth Amendment Rights Were Violated And The Evidence Obtained From The Car Should Have Been Suppressed At Trial.

*First*, Mr. Williams argues that Sergeant Brown's unjustified use of force on him transformed a traffic stop into an arrest unsupported by probable cause, and that the evidence police found in the car should have been suppressed as the fruits of an illegal arrest. In the alternative, he contends that even if the arrest were lawful, there was insufficient probable cause to support a warrantless search of the vehicle. The State responds that Sergeant Brown's use of force was "reasonable to further a lawful *Terry*[3] stop" and that Sergeant Brown had probable cause to search the vehicle because Mr. Williams threw two bags of marijuana under the car and had another bag of marijuana and a "large amount of cash" on his person. Alternatively, the State argues that the inevitable discovery exception applies. We agree with Mr. Williams that the search was unlawful.

Our review of a motion to suppress "is 'limited to the record developed at the suppression hearing.'" *State v. Johnson*, 458 Md. 519, 532 (2018) (*quoting Moats v. State*, 455 Md. 682, 694 (2017)). "We view the evidence and inferences that may be drawn

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

therefrom in the light most favorable to the party who prevails on the motion," *id.* (*quoting Raynor v. State*, 440 Md. 71, 81 (2014)), in this instance the State. We accept the suppression court's factual findings unless they are clearly erroneous, "but we review *de novo* the court's application of the law to its findings of fact." *Pacheco v. State*, 465 Md. 311, 319 (2019) (cleaned up). And ultimately, we render an "independent constitutional evaluation" of a constitutional challenge to a search or seizure. *Id.* (*quoting Grant v. State*, 449 Md. 1, 15 (2016)).

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. A "seizure" of a person means any nonconsensual detention. *Norman v. State*, 452 Md. 373, 386–87 (2017). Warrantless searches are presumed to be unreasonable, so "[w]hen a police officer conducts a warrantless search or seizure, the State bears the burden of overcoming the presumption of unreasonableness." *Thornton v. State*, 465 Md. 122, 141 (2019). There are, however, limited exceptions to the warrant requirement, including the stop and frisk procedure outlined in *Terry v. Ohio*, 392 U.S. 1 (1968). *Thornton*, 465 Md. at 141. Ultimately, though, "[t]here are two types of seizures of a person: (1) an arrest, whether formal or *de facto*, which must be supported by probable cause; and (2) a *Terry* stop, which must be supported by reasonable articulable suspicion." *Norman*, 452 Md. at 387.

   1. *The* Terry *frisk was unlawful.*

Under *Terry*, a "frisk" is limited "to a pat-down of [an individual's] outer clothing," and is meant to protect the officer and others, not to discover evidence. *Thornton*, 465 Md. at 142 (*quoting Bailey v. State*, 412 Md. 349, 368 (2010)). For that reason, *Terry* allows a

police officer to frisk someone they believe to be "armed and dangerous" for the safety of themselves and others. *Norman*, 452 Md. at 387. The frisk must be supported by "particularized suspicion *at its inception*." *Thornton*, 465 Md. at 142 (emphasis added). The officer doesn't need to be certain that the individual in question is armed and dangerous, but must "have 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *Id.* (*quoting Sellman v. State*, 449 Md. 526, 541 (2016) (brackets omitted)).

When a court considers whether an officer had reasonable articulable suspicion to frisk an individual, it "must take an objective view of the totality of the circumstances." *Id.* at 143. Then it must decide whether a reasonably prudent police officer "would have felt that he [or she] was in danger, based on reasonable inferences from particularized facts in light of the officer's experience." *Id.* (*quoting Bailey*, 412 Md. at 365). Our inquiry is fact-specific. *Id.*

We cannot see how, based on his testimony to the suppression court, Sergeant Brown's frisk was supported by reasonable articulable suspicion from its inception. The Court of Appeals has described reasonable articulable suspicion as "a commonsense, nontechnical concept" and noted that we "give due deference to a law enforcement officer's experience and specialized training . . . ." *Norman*, 452 Md. at 387. But reasonable articulable suspicion can't just be a hunch, and an officer can't frisk someone just because he initiated a lawful traffic stop. *Id.*

Here, Sergeant Brown's testimony did not rebut the presumption that the search was unreasonable. Sergeant Brown has a long history working as a law enforcement officer,

starting his career in 1997. At the time of the stop, he was working as patrol supervisor and stated that he's responsible for traffic stops "at times." Sergeant Brown stated that he was on patrol on Linden Avenue in an unmarked police vehicle when he saw Mr. Williams driving with "his cell phone up to his ear." He "turned around and initiated a traffic stop on the vehicle on Bank Street" a "short time later." He specified that the stop occurred "two to five minutes" after he activated his emergency equipment. Sergeant Brown testified that as he was getting out of his vehicle, Mr. Williams "quickly got out of his vehicle" as well. He didn't identify himself as a police officer or say anything else to Mr. Williams after he got out of his vehicle. He then "approached [Mr. Williams] quickly as he got out," and as he approached, he observed that Mr. Williams "turned his back to [him] quickly" and "held something in his hands." He said Mr. Williams "clenched his hands together," so he "grabbed him" because he "didn't know what he had in his hands." After grabbing Mr. Williams, Sergeant Brown "wrestled" him to the ground and "told him to [] stop resisting," his first oral communication with Mr. Williams. Sergeant Brown "told him to put his hands behind his back," and when Mr. Williams didn't comply, Sergeant Brown pepper sprayed him. Then, Mr. Williams stopped struggling and threw two baggies under his car. He testified that he "eventually" placed Mr. Williams in handcuffs after Mr. Williams threw marijuana under the car. And he "ended up searching the vehicle" and Mr. Williams's person.

Viewing the facts under the totality of the circumstances, the State has failed to present sufficient evidence to rebut the presumption that the warrantless frisk was unreasonable. At the time Sergeant Brown took down Mr. Williams, he knew that:

14

(1) Mr. Williams had been talking on his cell phone while driving; (2) Mr. Williams stopped his car after emergency equipment was activated (although he contradicts himself on how long it took Mr. Williams to stop); (3) as he got out of his police car, Mr. Williams got out of his car quickly as well; (4) Mr. Williams was facing forward; and (5) Mr. Williams had his hands clenched together. Sergeant Brown never expressed any belief that Mr. Williams posed a risk to his safety or the safety of others around them. Similarly, his testimony included no expressions of fear, and no sense that he was afraid, felt he was in danger, or that Mr. Williams appeared to be engaged in criminal conduct.

Again, a *Terry* frisk is meant to protect officers and bystanders from risks posed by weapons. *Thornton*, 465 Md. at 146. And "[t]o articulate reasonable suspicion, an 'officer *must explain* how the observed conduct, when viewed in the context of all other circumstances known to the officer, was indicative of criminal activity.'" *Thornton*, 465 Md. at 147 (*quoting Sizer v. State*, 456 Md 350, 365 (2017) (emphasis added)). The record at the suppression hearing reveals no such risks or observations.

Sergeant Brown is an experienced law enforcement officer, and he didn't attempt here to explain how Mr. Williams's conduct, at the inception of the seizure, was potentially criminal or dangerous. He didn't say how his training and experience made him believe that what he observed may have been criminal activity. *See Sellman*, 449 Md. at 549 ("[T]he officer must explain how the observed conduct, when viewed in the context of all of the other circumstances known to the officer, was indicative of criminal activity.") (*quoting Crosby v. State*, 408 Md. 490, 508 (2009)). Under the totality of the circumstances, Sergeant Brown did not have reasonable suspicion to frisk Mr. Williams,

15

and we will not "'rubber stamp' conduct simply because the officer believed he had the right to engage in it." *In re Jeremy P.*, 197 Md. App. 1, 22 (2011). The State didn't rebut the presumption that the take-down and search were unreasonable, and Sergeant Brown violated Mr. Williams's rights when he conducted an unlawful *Terry* frisk.

>  2. *Mr. Williams was placed under arrest when he was wrestled to the ground and handcuffed, and that arrest wasn't supported by probable cause.*

*Next*, we consider Mr. Williams's alternative argument that the non-*Terry* seizure was a *de facto* arrest not grounded in probable cause. An arrest is the "detention of a known or suspected offender for the purpose of prosecuting him for a crime." *Longshore v. State*, 399 Md. 486, 502 (2007) (*quoting Bouldin v. State*, 276 Md. 511, 516 (1976)). A detention normally occurs where there is a "touching by the arrestor or when the arrestee is told that he is under arrest and submits . . . ." *Longshore*, 399 Md. at 502 (*quoting Bouldin*, 276 Md. at 516). "[W]hile a formal arrest occurs when an officer informs the suspect that he or she is under arrest, a *de facto* arrest occurs when the circumstances surrounding a detention are such that a reasonable person would not feel free to leave." *Reid v. State*, 428 Md. 289, 299–300 (2012).

We examined the elements of an arrest in *Bouldin v. State*:

> It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested . . . . It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and

16

(4) which is understood by the person arrested . . . .

276 Md. at 515–16 (internal citations omitted). Generally, displays of force such as handcuffing an individual are considered arrests, but courts have found exceptions where the individual was handcuffed for the officer's safety or to prevent flight. *Longshore*, 399 Md. at 502; *Elliott v. State*, 417 Md. 413, 429 (2010); *but see In re David S.*, 367 Md. 523 (2002) (protect the officer); *Trott v. State*, 138 Md. App. 89 (2001) (prevent suspect's flight). The burden is on the State to prove that any special circumstances justified the use of force as part of an investigative detention, *i.e.*, where the officer used handcuffs to protect his own safety or to keep the suspect from fleeing. *Elliott*, 417 Md. at 429. In making this determination, we consider the totality of the circumstances. *In re David S.*, 367 Md. at 535.

Here, Mr. Williams was under arrest when he was tackled, wrestled to the ground, and sprayed with pepper spray. Again, he was stopped for talking on a cell phone while driving, not a criminal offense, and was taken down after he got out of his car quickly, faced forward, and had his hands clenched. Sergeant Brown then took him down, wrestled with him, told him to "stop resisting," told him "to put his hands behind his back," and pepper sprayed him. At that point, no reasonable person would feel free to leave. And because the record reveals no evidence or testimony that force was necessary to protect officer safety or prevent flight, this conduct did not fall under an exception. *See id.* at 523. The State speculates that Mr. Williams could have been in possession of a weapon, but Sergeant Brown's testimony at the suppression hearing doesn't support a finding that he was or might have been. Additionally, Mr. Williams was standing still near his car and

17

there was no suggestion by the State that he posed a flight risk. On this record, Mr. Williams was arrested without a warrant.

From there, we look *next* at whether the warrantless arrest was supported by probable cause. "Probable cause to arrest 'exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense." *Barrett v. State*, 234 Md. App. 653, 666 (2017) (*quoting Moulden v. State*, 212 Md. App. 331, 344 (2013)). Probable cause is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (*quoting Maryland v. Pringle*, 540 U.S. 366, 370 (2003)). It is a fluid construct that depends on an assessment of probability within a specific factual context. *Id.* "A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion." *Id.* (*quoting Moulden*, 212 Md. App. at 344). We assess whether an officer had probable cause to arrest by examining the events leading up to the arrest and deciding "whether these historical facts viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Id.* (*quoting Pringle*, 540 U.S. at 371) (internal quotations omitted)).

When Mr. Williams was placed under arrest, Sergeant Brown had seen him get out of his car quickly, face forward, and clutch something in his hands. Sergeant Brown "approached him quickly as he got out" of his car, wrestled him to the ground, told him to stop resisting, put his hands behind his back, and pepper sprayed him. On that record, no

objectively reasonable police officer would have had cause to believe that Mr. Williams had committed or was committing a crime. Remember, at that point the Sergeant had not seen or sensed any contraband or potential contraband—that came later. Therefore, the arrest was unlawful, as was the ensuing search. *See Pacheco*, 465 Md. at 331 ("The Supreme Court has long held that a search incident to a lawful arrest is permissible only if the underlying arrest is lawful.").

Even if we delayed the point of arrest until Sergeant Brown "eventually" handcuffed Mr. Williams, there still would not be probable cause to support the arrest. After Sergeant Brown wrestled Mr. Williams to the ground and pepper sprayed him, Mr. Williams threw two baggies of what appeared to be marijuana under the car, and Sergeant Brown placed him in handcuffs. Sergeant Brown testified that it later became apparent to him that those two baggies contained a non-criminal amount of marijuana. He then searched Mr. Williams's *person* and found a third baggie of marijuana, also in a non-criminal amount, and $443 cash. It wasn't until Sergeant Brown searched the *car* that he discovered empty baggies in the center console, a cell phone in the passenger seat of the vehicle, and a scale and a larger, criminal amount of marijuana in the trunk of the car.

The Court of Appeals has analyzed recently, and at length, the onset of probable cause to search a car when the officer detects an odor of marijuana emanating from inside it. *See e.g.*, *Pacheco*, 465 Md. 311 (holding officers had probable cause to search vehicle when they detected the odor of marijuana emanating from car and observed joint in center console, but did not have probable cause to search defendant's person when a non-criminal amount of marijuana was found in the vehicle); *Robinson v. State*, 451 Md. 94, 133 (2017)

19

(holding that officer had probable cause to search the vehicle where the officer detected an odor of marijuana emanating from the vehicle); *Bowling v. State*, 227 Md. App. 460, 469 (2016) (holding that drug-sniffing dog's alert to the odor of marijuana in a vehicle was sufficient probable cause for officers to search the vehicle). But this case is easily distinguishable—other than the indisputably non-criminal marijuana in the baggies tossed under the car, there were no additional indicia that a crime had taken place. There was no odor of marijuana emanating from the car. Nor did Sergeant Brown testify that he thought Mr. Williams was under the influence of marijuana. *See Barrett*, 234 Md. App. at 667 (holding that probable cause existed to search a vehicle where defendant admitted to smoking marijuana, handed the officer a cigar containing marijuana, and the odor of marijuana emanated from the vehicle and the defendant's person). Without any basis to believe there was additional marijuana present, there was no probable cause to search the car. The record doesn't support the conclusion that Sergeant Brown had probable cause to arrest Mr. Williams based on the belief that he was committing, had committed, or was about to commit a crime in his presence.

3. *The evidence found on Mr. Williams's person and in his car should have been excluded at trial.*

*Lastly*, we turn to whether the evidence should have been excluded at trial. The State argues that even if the search and arrest were unlawful, the evidence inevitably would have been discovered. It argues that Sergeant Brown "was justified in towing [Mr. Williams's] vehicle" and that a routine inventory search would have revealed the criminal amount of marijuana. We disagree.

20

Under the exclusionary rule, evidence obtained after an individual's Fourth Amendment rights were violated is inadmissible in a criminal prosecution. *Thornton*, 465 Md. at 150. This is because that evidence is considered "fruit of the poisonous tree," or evidence that was derived because of illegal conduct. *Id.* Suppression is "our last result, not our first impulse." *Id.* (*quoting Utah v. Strieff*, 136 S.Ct. 2056, 2058 (2016)). The inevitable discovery exception to the exclusionary rule applies "where evidence is not actually discovered by lawful means, but inevitably would have been." *Williams v. State*, 372 Md. 386, 410 (2002) (*quoting State v. Winkler*, 552 N.W.2d 347, 354 n.4 (N.D. 1996)). The doctrine focuses "on what would have happened if the illegal search had not aborted the lawful method of discovery." *Id.* (*quoting Winkler*, 552 N.W.2d at 354 n.4). If the evidence would have been discovered through lawful means, then the evidence is admissible. *Id.* The State has the burden of proving by a preponderance of the evidence that the evidence would have been found inevitably by lawful means. *Id.* at 417.

The State premises its inevitable discovery doctrine argument on the fact that when Mr. Williams stopped his car during the traffic stop, he pulled onto someone's private property (there was no shoulder on Bank Street). It argues that under Pocomoke City police policy, the officer could have towed the vehicle for non-investigatory "safekeeping" purposes to minimize the risk of theft and that they would have discovered the evidence upon conducting an inventory search. Alternatively, the State cites Maryland Code (1977, 2012 Repl. Vol., 2019 Supp.), § 21-1004(e) of the Transportation Article, which forbids drivers from parking a vehicle on private property without permission of the property owner, as grounds for the tow.

We are not convinced that either scenario inevitably would have led the police to discover the evidence at issue here. Mere speculation does not satisfy the demands of the inevitable discovery doctrine. *Williams v. State*, 372 Md. 386, 416 (2002). An "unsupported assertion . . . is no substitute for evidentiary proof." *Id.* (*quoting Stokes v. State*, 289 Md. 155, 165 (1980)). The "government must establish that it *has not* benefitted by the illegal acts of its agents; a showing that it *might not* have so benefitted is insufficient." *Id.* (*quoting Stokes*, 289 Md. at 165). The police here would only have been able to tow and conduct an inventory search of the car if Mr. Williams's arrest was lawful and the car was left on someone's property. The car would not have been left but for the unlawful arrest, so the State has failed to demonstrate here that the car would have been towed regardless. Accordingly, the evidence gathered by the police after the unlawful take-down was inadmissible and should have been suppressed.

### B. The Evidence Was Insufficient To Convict Mr. Williams Of Resisting Arrest.

*Next*, Mr. Williams argues that the evidence was insufficient to convict him of resisting arrest because Sergeant Brown didn't have probable cause to believe he possessed a criminal amount of marijuana when he resisted. He argues that the State "failed to prove that Mr. Williams threw the bags before he stopped resisting, or that Sergeant Brown believed the bags contained a criminal amount of marijuana." (emphasis omitted). Alternatively, Mr. Williams argues that even if he continued resisting after Sergeant Brown observed the bags being thrown, the marijuana was in a non-criminal amount and therefore Sergeant Brown didn't have probable cause to support the arrest. The State responds that

22

the evidence was sufficient because "a reasonable factfinder could find that [Mr. Williams] resisted arrest after he threw the marijuana," when Sergeant Brown had probable cause to arrest him for criminal possession of marijuana (emphasis omitted).

The standard of review of sufficiency of the evidence is "whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." *Olson v. State*, 208 Md. App. 309, 328 (2012) (*quoting Moye v. State*, 369 Md. 2, 12 (2002)). We view the evidence in the light most favorable to the State. *Id.* We will not re-weigh the evidence, but we determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt of the charges. *Id.*

Resisting arrest was a common law offense until the legislature codified it in 2004. *See* Maryland Code (2002, 2012 Repl. Vol.), § 9-408 of the Criminal Law Article ("CR"). In *DeGrange v. State*, this Court outlined the crime of resisting arrest:

> The applicable statute, Md. Code (2012 Repl. Vol., 2013 Supp.), § 9-408(b) of the Criminal Law Article ("C[R]"), provides that "[a] person may not intentionally resist a lawful arrest." The elements of the crime that the State must prove are that: (1) a law enforcement officer arrested or attempted to arrest the defendant; (2) the arrest was lawful, and; (3) the defendant refused to submit to the arrest and resisted the arrest by force. The purpose of criminalizing such behavior is to protect police officers from the substantial risk of physical injury.

221 Md. App. 415, 421 (2015) (cleaned up). But the legislature didn't define the term "resist a lawful arrest" in the statute, and because the legislature didn't indicate an intent to change the common law, the elements of resisting arrest are still as defined at common law. *Rich v. State*, 205 Md. App. 227, 239 (2012). And because Sergeant Brown lacked

probable cause for the arrest, there was no lawful arrest as required by CR § 9-408(b), and there could not be evidence sufficient to convict Mr. Williams of the crime of resisting arrest.

### C. The Circuit Court's Jury Selection Method Is Not Impermissible *Per Se*, But It's Risky And Ill-Advised.

Although we have resolved the appeal on Fourth Amendment grounds, we nevertheless will address Mr. Williams's argument that the trial court excluded significant parts of the community from the jury without a finding of bias, and that the court's method of selecting the jury violated his right to an impartial jury drawn from a fair cross-section of the community. The State responds that the court acted within its discretion and that, on these facts, the record does not reveal that any particular group was excluded from this jury. That's true as far as it goes. As we explain, though, this method, even if it once appeared in the *Jury Selection Questions* manual, risks skewing a jury impermissibly, and the marginal immediate-term savings of judicial resources is not worth that risk.

In Maryland, "facilitating 'the intelligent exercise of peremptory challenges' is not a purpose of *voir dire*[.]" *Pearson v. State*, 437 Md. 350, 356–57 (2014) (*quoting Washington v. State*, 425 Md. 306, 312 (2012)). Instead, we conduct limited *voir dire* "to ensure a fair and impartial jury by determining the existence of [specific] cause for disqualification[.]" *Id.* at 356 (*quoting Washington*, 425 Md. at 312). The trial judge has broad discretion over *voir dire*, in "determin[ing] the content and scope of questions on voir dire [and] how voir dire will be conducted . . . ." *Dingle v. State*, 361 Md. 1, 14 (2000); *see Wright v. State*, 411 Md. 503, 508 (2009). Ultimately, the scope of *voir dire* rests within

24

the trial judge's discretion, *Washington*, 425 Md. at 313 (*citing Curtin v. State*, 393 Md. 593, 603 (2006)), and we evaluate the judge's *voir dire* methodology to determine whether that discretion has been abused. *Wright*, 411 Md. at 507.

Mr. Williams contends that he was deprived of an impartial jury, and although we can see how this method could lead to such a result, we cannot discern from this record that it actually occurred here. Defendants have a right to "an impartial jury" under the Sixth Amendment and Article 21 of the Maryland Declaration of Rights. U.S. Const. amend. VI; Md. Decl. of Rights Art. 21. Generally, "it is not reversible error for the [c]ourt of its own motion to exclude a juror, even for insufficient cause, if an unobjectionable jury is afterwards obtained." *King v. State*, 287 Md. 530, 538 (1980) (*quoting Blumenthal & Bickart v. May Co.*, 127 Md. 277, 285–86 (1915)).  In *Bridges v. State*, we clarified that "[t]he character of a jury as impartial is something quite distinct from the character of a jury as representative of a fair cross-section of the population." 116 Md. App. 113, 120 (1997). We have defined impartiality in terms of open-mindedness and freedom from bias:

> The minds of such men always remain open to the correction of former impressions, and remain entirely impartial, with power to hear and determine upon the real facts of the case, without the least bias in favor of former impressions, whatever they may have been. And therefore, in our present state of society, all that can be required of a juror is that he should be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and render a verdict thereon without regard to any former opinion or expression existing in his mind.

*Bridges*, 116 Md. App. at 120–21 (*quoting Garlitz v. State*, 71 Md. 293, 300 (1889)). The party claiming that he was denied the right to an impartial jury has the burden of proving

25

that the jury selected ultimately was partial or biased. *Id.* at 121 ("Bias on the part of prospective jurors will never be presumed, and *the challenging party bears the burden* of presenting facts . . . which would give rise to a *showing of actual prejudice*.").

There is precedent for a challenge like this. In *Wright v. State*, the Court of Appeals held that the trial court's *voir dire* method deprived the defendant of a fair and impartial jury when the trial court conducted *voir dire* in a manner that left potential jurors confused. 411 Md. 503 (2009). In *Wright*, the court asked the entire fifty-person venire a list of seventeen *voir dire* questions in rapid succession without pausing in between questions to record responses. *Id.* at 506. Instead, the court waited until the end of the collective questioning to solicit the potential jurors' responses. *Id.* Defense counsel argued that the members of the venire couldn't remember all the questions asked by the time they had a chance to respond, rendering the entire method of rooting out bias ineffective. *Id.* The Court of Appeals held that "[a] trial court reaches the limits of its discretion only when the voir dire method employed by the court fails to probe juror biases effectively." *Id.* at 508. It indicated that the method may have obscured critical information about bias "by failing to ensure that the jurors on the venire made reasonably full disclosures," and therefore the trial court could not effectively guarantee a fair and impartial jury was selected. *Id.* at 513. The jurors may have had biases that the court's method failed to flesh out properly, leaving both the court and the parties uninformed about which jurors might be biased.

Mr. Williams offers a variation on this theme: did the trial court's attempt to shortcut *voir dire* by deferring, and possibly avoiding, consideration of potential jurors who respond to any of the court's questions deprive him of a fair and impartial jury? In the trial court's

view, skipping all *potentially* biased members of the venire *ensures* an unbiased jury. This presents risks distinct from the primary risk in *Wright*, *i.e.*, that a potentially biased individual might slip through the cracks onto the jury due to ineffective questioning by the court. Instead, the method used here raises the question of whether cutting out *all* individuals who responded affirmatively to any *voir dire* question overly excluded potential jurors in a manner or to a degree that violated Mr. Williams's rights.

It is easy to imagine circumstances in which this method can go wrong. Most obviously, a *voir dire* method should not skew the demographics of the jury impermissibly from the demographics of the venire. If, for example, deferring consideration of venirepeople who answered questions had the effect of eliminating potential jurors based on their race, *see Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that the Equal Protection Clause of the U.S. Constitution precludes a prosecutor from exercising peremptory challenges solely based on the prospective jurors' race), gender, *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) and *Tyler v. State*, 330 Md. 261 (1993) (holding that the *Batson* principle extends to exclusion of a person from service because of her sex), or sexual orientation, *see SmithKline Beecham Corp. v. Abbot Labs.*, 740 F.3d 471 (9th Cir. 2014) (holding that heightened scrutiny under *Batson* applies to discrimination on the basis of sexual orientation), the method itself would sort the venire in a manner that the Constitutions of the United States and Maryland forbid.

The problem in assessing jury selection in this case, though, is that the record contains no data or information from which we could determine whether or to what extent the selection methodology skewed the jury. Mr. Williams, the party with the burden of

27

persuasion, hasn't argued that his jury was partial, or even that potential jurors with particular qualities were excluded from consideration. We know the numbers of the jurors who answered various questions, and thus who were sent to the back of the line, as it were. And Mr. Williams argues, correctly, that we don't know how they would have answered follow-up questions about their ability to decide the case based solely on the facts and the law. But the possibility of substituting one venireperson who didn't raise their hand for another who might have been able to serve doesn't mean necessarily that the jury was skewed. Without some more concrete sense of who was deferred and the demographic or other qualities the selection method eliminated from the venire, we can't assess whether this particular jury was skewed unfairly or illegally.

Demographics aside, Mr. Williams also asks us to find that the jury selection process deprived him of a jury selected from a fair cross-section of the community. He argues that the court's *voir dire* method "excluded significant parts of the community from the jury without a finding of bias." To be sure, he has a constitutional right to a jury selected from a fair cross section of the community, but "[i]t is not necessary . . . that the jury actually selected be representative of the community." *Wilkins v. State*, 270 Md. 62, 65 (1973). Not every jury must "contain representatives of all the economic, social, religious, racial, political[,] and geographical groups of the community . . . ." *Id. (quoting Thiel v. S. Pacific Co.*, 328 U.S. 217, 220 (1946)). Still, "prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups." *Id.* And section 8-104 of the Courts & Judicial Proceedings Article ("CJ"), Maryland Code (1973, 2013 Repl. Vol.) states that "[e]ach jury for a county shall be selected at random from a fair cross

section of the adult citizens of this State who reside in the county."

In reviewing this claim, we ask whether the court's method "produced a systematic or intentional exclusion of any *cognizable group* or class of qualified citizens." *Id.* at 66. We apply the following test:

> [First,] there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace.

*Wilkins*, 270 Md. at 67 (cleaned up); *see also Miller v. State*, 53 Md. App. 1, 10 (1982) (holding that a 20- to 40-year-old age group was not a "cognizable" group in the context of their exclusion from a jury).

Nothing in the record supports a finding that the "significant parts of the community" he identifies qualify as a cognizable group. He argues broadly that the court excluded "large groups of prospective jurors" by not selecting jurors that responded to the following questions:

- "[D]o you know any of those witnesses [Sergeant Rudell Brown, Corporal Rodney Wells, or Jessica Taylor] in any capacity?"

- "Would you give any greater or lesser credit or weight to the testimony of a police officer over that of a witness in another occupation merely because of his or her status as a police officer? Greater or lesser credit or weight to a member of law enforcement."

29

- "Have any of you or any member of your immediate family, immediate family is defined as your parents, your children, your siblings or spouses of siblings. Have any of you or any members of your immediate family ever been the victim . . . . of a crime similar to the crimes charged, a witness to a crime similar to the crimes charged or arrested for, charged with or convicted of a crime similar to the crimes charged?"
- "Have you ever been a member of a law enforcement agency?"

But Mr. Williams does not explain how individuals who responded to these questions constitute one or more cognizable groups.

Even so, we will examine whether excluding jurors who answered any of these questions could have resulted in the exclusion of a cognizable group. Mr. Williams relies heavily on *King v. State*. 287 Md. 530 (1980), a case in which two potential jurors were excluded "solely because of their beliefs that the law concerning marijuana, under which the defendants were charged, ought to be changed." *King*, 287 Md. at 531. The Court of Appeals held that the exclusion of these potential jurors was improper because "the mere statement by a juror of his belief that the criminal law concerning marijuana ought to be modified, without more, does not indicate that the juror is biased, prejudiced[,] or unqualified to be a juror in a prosecution for possession and distribution of marijuana." *Id.* at 535–36. The Court indicated that the individuals hadn't displayed an inability to apply the law properly and that "if all such individuals were automatically excluded from juries hearing criminal cases like the instant one, a large part of the community would be excluded from jury service in many criminal prosecutions under the laws relating to controlled dangerous substances," *id.* at 536–37, which would violate the policy that "petit jurors 'shall be selected at random from a fair cross section of the citizens of the State." *Id.* at 537

(*quoting* CJ § 8-102(a)).

But unlike in *King*, the record reveals no "common thread" or similarity here in the attitudes, ideas, or experience among the twenty individuals not selected for this jury, *see Wilkins*, 270 Md. at 67, nor any connection to the crime(s) at issue. The group included people who responded to four distinct questions designed to reveal an array of potential attitudes, ideas, or experiences. Mr. Williams conceded during oral argument that he couldn't identify a single cognizable group to meet this test, and that's consistent with the information we have. This leaves him without a *prima facie* showing that his right to a jury drawn from a fair cross-section of the community was violated.

Our inability to find a violation of Mr. Williams's rights on this record should not be read to suggest that we endorse or are comfortable with the jury selection method employed here. We don't and we're not. This approach may have been included in earlier editions of Maryland State Bar Association's publication *Jury Selection Questions for Criminal and Civil Trials*, but it was left out of the 2018 version (this trial took place on June 11, 2019),[4] and, in our view, for good reason. The purpose of *voir dire* is not to select

---

[4] The trial court credits the method's inclusion in the *Jury Selection Questions* manual as a reason to believe it reliable. But although the Court of Appeals has cited that publication positively, it has never done so in connection with any section written on jury selection methods. *See Kazadi v. State*, 467 Md. 1, 42 n.11 (2019) (*citing* the affirmative treatment of the Special Committee on Voir Dire in *Collins v. State*, 452 Md. 614, 630, 632 (2017)); *Collins*, 452 Md. at 632 ("We appreciate the good work of the Committee and commend to bench and bar alike a review of the model questions in their entirety. The thoughtful commentary and recommendations in the report should make it as easy as practicable for venire members to disclose information fully and with candor."). This method was contained in the 2015-2016 edition, the version the trial court used, but that edition had been superseded by the time of trial.

a jury of people who are pristinely or ignorantly unaware, but to eliminate bias that prevents prospective jurors from finding the facts and applying the law as the court instructs them. It's not disqualifying for a juror to have strong feelings, only to seat a juror whose feelings overwhelm their ability to serve fairly and impartially. Aside from its demographic-skewing potential, this method will always risk over-excluding people who are or have family members who have served in law enforcement, *see Pearson v. State*, 437 Md. 350, 368 (2014),  who have been victims of crime, *see Perry v. State*, 344 Md. 204 (1996), who have strong feelings about a particular crime or punishment, *see Pearson*, 437 Md. at 363, and people in different age or occupational groups, *see Miller*, 54 Md. App. at 11— categories of people that aren't necessarily protected in the same way race and gender are (although these groups may well correlate with race or gender), but whose complete absence deprives the jury of important perspectives and experiences. Moreover, this method places solely on defense counsel the onus to monitor the venire in real time and collect information on excluded potential jurors else, as here, the trial court and appellate courts won't be able to assess the impact of the reordering. Although in this case we cannot find that the jury was skewed improperly, the marginal improvement in judicial efficiency from selecting a jury this way does not seem to be worth the risk of unfair trials, reversals, and retrials.

> **JUDGMENTS OF THE CIRCUIT COURT FOR WORCESTER COUNTY FINDING MR. WILLIAMS GUILTY OF POSSESSION WITH INTENT TO DISTRIBUTE MARIJUANA, POSSESSION OF MARIJUANA, AND RESISTING ARREST REVERSED. JUDGMENT**

**FINDING MR. WILLIAMS GUILTY OF DRIVING ON A SUSPENDED LICENSE AFFIRMED. WORCESTER COUNTY TO PAY COSTS.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0858s19cn.pdf