IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2022 Session

## MATTHEW REYES CAMACHO v. JESSICA LYNNE CAMACHO

**Appeal from the Chancery Court for Maury County**
**No. 20-173   Russell Parkes, Judge**
_____

**No. M2021-00994-COA-R3-CV**
_____

Mother appeals the trial court's order naming Father primary residential parent. Because the trial court's findings of fact are at times vague, inconsistent, and appear to improperly rely on the trial judge's recollection of testimony from a prior hearing rather than appropriate proof, we vacate the judgment of the trial court and award Mother her reasonable attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and CARMA DENNIS MCGEE, JJ., joined.

Christina Hammond Zettersten, Brentwood, Tennessee, for the appellant, Jessica Lynne Camacho.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

The parties, Jessica Lynne Camacho ("Mother") and Matthew Reyes Camacho ("Father") were married in 2013. Two children were born of the marriage, a son born in 2007 ("Son"), and a daughter born in 2010 ("Daughter"). Father filed a complaint for divorce in April 2020 in Maury County Chancery Court ("the trial court"). The parties enjoyed equal parenting time in the summer of 2020.

In July 2020, the trial court held a pendente lite hearing to determine a temporary parenting plan for the children. In an August 5, 2020 order, the trial court found that Father

was "not credible, was evasive," and was currently in recovery from an alcohol problem. The trial court further found that Mother's boyfriend, Adam Stamey, was "a horrible witness." Mother, however, was "impressive." Moreover, the trial court found that Mother's role as the children's primary caregiver strongly favored Mother. As such, the trial court ultimately concluded that Mother would be named the primary residential parent, while Father was essentially awarded every other weekend visitation once school began. The trial court also cautioned Mother that she would "be served well not to expose the children to Mr. Stamey."

A final hearing occurred on July 22, 2021. Mother, Father, and Son were the primary witnesses. Mother focused much of her testimony on Father's history of alcohol abuse and his failure to be involved with the family due to his alcohol use. Father admitted that his alcohol use made him uninvolved with the children during the marriage. He testified, however, that at the time of the separation he completed a month-long inpatient alcohol rehabilitation program and that he had been sober for a year. Mother testified in contrast that despite Father's sobriety he still was not involved in the children's lives, as she was the parent who attended all sporting and school events, made all doctor's appointments, and ensured that the children had their medicine even when staying with Father. Father testified, however, that he had attended one sporting event, one telephonic school conference, and some doctor's appointments for the children.

Father focused much of his testimony on Mother's romantic relationship with Mr. Stamey. The proof at trial showed that Mother had largely denied being romantic with Mr. Stamey at the pendente lite hearing, while Mr. Stamey had admitted that the pair was romantic. Moreover, by the time of the divorce trial, Mother had given birth to another child; there was no dispute that this child was fathered by Mr. Stamey, rather than Father. So it appeared that Mother and Mr. Stamey conceived this child only a few months after the pendente lite hearing. Still, Mother testified that Mr. Stamey does not live with her and that she only spends overnights with him when the children are with Father. Son confirmed that Mr. Stamey did not live with Mother, but that he does bring his own daughter to Mother's home, as she and Daughter are long-time best friends.

Mother was somewhat equivocal about her plans to marry and move in with Mr. Stamey in the future, stating that it was not a near-future plan. Father objected to his children being around Mr. Stamey at all. When asked why, he stated that his objection stemmed from Mr. Stamey's "inappropriate conduct with my wife," explaining that such conduct does not "set[] a good example for my children." He admitted, however, that he was friends with Mr. Stamey for years before the romantic relationship and had no qualms about the man being around his children prior to the separation. Mr. Stamey did not testify at the final hearing.

The parties' living arrangements were also at issue. Both parties had vacated the marital residence. Mother was living in a two-bedroom trailer owned by her mother; the

- 2 -

children shared a room in this residence. Father lived in a five-bedroom home with his mother, step-father, and a roommate. The children had their own rooms in this home, though Father admitted that his step-father drinks in the home and can be loud at times.

The trial court entered its written final order on August 6, 2021. Therein, the trial court referenced the proof submitted at the pendente lite hearing including that Mr. Stamey was a "horrible witness," "made terrible choices," and "was not a good person." The trial court further found that at the prior hearing, Mr. Stamey's "demeanor on the witness stand was poor" and he was "completely without credibility, his testimony incredible, and not worthy of belief." The trial court also found that Mother had lied to the court about her relationship with Mr. Stamey. In contrast, the trial court found that Father was credible at the final hearing. Ultimately, after considering the statutory best interest factors, the trial court found that Father should be named primary residential parent and Mother awarded essentially every other weekend visitation with the children. The trial court also ruled that "[n]either parent shall have guests of the opposite sex overnight under inappropriate circumstances." Mother thereafter appealed to this Court.

## II. ISSUES PRESENTED

Mother raises three issues, which are taken from her appellate brief:

1. Whether the trial court abused its discretion by naming Father as the primary residential parent and only awarding Mother 107 days of parenting time?
2. Whether the trial court abused its discretion by including a paramour provision in the parenting plan?
3. Whether Mother should be awarded her attorney fees?

Father did not file a brief or otherwise participate in this appeal.

## III. ANALYSIS

The central issue in this case is the permanent parenting plan ordered by the trial court. "While a trial court has broad discretion in fashioning a parenting plan, the touchstone is the best interest of the child." *Smallbone v. Smallbone*, No. M2020-01556-COA-R3-CV, 2022 WL 1405655, at \*4 (Tenn. Ct. App. May 4, 2022) (citing Tenn. Code Ann. § 36-6-106(a) (2017); *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013)). While a trial court's determination of whether a parenting plan serves a child's best interest is a finding of fact, *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013), "determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Id.* at 693 (quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). As a result,

"It is not the function of appellate courts to tweak a [residential parenting

schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693.

Generally, a parenting plan should allow each parent maximum participation in the life of the child consistent with "the location of the residences of the parents, the child's need for stability," and the non-exclusive best interest factors contained in section 36-6-106(a)(1)–(15).[1] Tenn. Code Ann. § 36-6-106(a). This provision does not, however, "mandate that the trial court establish a parenting schedule that provides equal parenting time[.]" *Gooding v. Gooding*, 477 S.W.3d 774, 784 n.7 (Tenn. Ct. App. 2015). Instead, "[t]he plain language of [s]ection 36-6-106(a) directs courts to order custody arrangements that allow each parent to enjoy the maximum possible participation in the child's life only to the extent that doing so is consistent with the child's best interests." *Flynn v. Stephenson*, No. E2019-00095-COA-R3-JV, 2019 WL 4072105, at *7 (Tenn. Ct. App. Aug. 29, 2019) (quoting *In re Cannon H.*, No. W2015-01947-COA-R3-JV, 2016 WL 5819218, at *6 (Tenn. Ct. App. Oct. 5, 2016)).

In order to determine the best interests of the children in this case, the trial court was required to consider the following factors:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents,

---

[1] The best interest factors changed slightly during the pendency of this appeal to include a new factor (16): "[w]hether a parent has failed to pay court-ordered child support for a period of three (3) years or more[.]" *See* 2022 Tenn. Laws Pub. Ch. 671 (H.B. 1866), eff. March 18, 2022. This new subsection is neither applicable nor relevant to the current case.

consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106 (2020).

The foregoing factors are non-exclusive, **Beyer v. Beyer**, 428 S.W.3d 59, 71 (Tenn. Ct. App. 2013), and "determining a child's best interest is a fact-sensitive inquiry." **Solima v. Solima**, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015). Consequently, we have held that

> [a]scertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

**Id.** (citing **In re Marr**, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)).

While "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination," the statute nevertheless "requires the trial court to consider all the applicable factors." **Murray v. Murray**, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010). Moreover, Rule 52.01 of the Tennessee Rules of Civil Procedure mandates that trial courts make findings of fact and conclusions of law following bench trials. As such, "Tennessee case law reflects that meaningful appellate review is far more feasible when the trial court's order demonstrates that it indeed considered the factors enumerated in section 36-6-106, and clearly articulates its reasoning in reaching its conclusion as to best interest." **Grissom v. Grissom**, 586 S.W.3d 387, 393–94 (Tenn. Ct. App. 2019). Therefore, "this Court has encouraged trial courts to 'be as precise as possible in making child custody findings' in order to facilitate meaningful appellate review." **Id.** (quoting **Belardo v. Belardo**, No. M2012-02598-COA-R3-CV, 2013 WL 5925888, at *7 (Tenn. Ct. App. Nov. 1, 2013)).

Mother's argument on appeal is two-fold. First, Mother argues that the trial court's determination that the children's best interests would be served by naming Father primary residential parent is based on improper factual findings. Second, Mother argues that the trial court's decision to impose a paramour clause does not comply with existing Tennessee law. We agree with Mother on both counts.

Here, the trial court did undertake an analysis of the relevant best interest factors. Some of those factors are considered in detail by the trial court. But often the trial court's findings do little to illuminate its reasoning. Take factor (1) as an example. The trial court's

finding as to this factor is as follows:

> The Court finds that when the determination of temporary custody occurred a year ago, this factor strongly favored Mother. The Mother has continued to be the primary caregiver under the Court's temporary parenting order. Considering the proof presented at trial, the Court now finds that this factor only slightly favors Mother.

Thus, the trial court notes that while Mother has continued to be the primary caregiver of the children, this factor—involving which parent has performed the majority of parenting responsibilities for the children—now only slightly favors Mother. But the trial court's order does not provide any factual findings explaining why it made this determination, particularly given a later finding that Mother "was performing most of the parenting responsibilities leading up to trial."

While "[t]here is no bright-line test by which to assess the sufficiency of factual findings," the trial court's "findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013) (internal quotation marks and citations omitted). Here, we are simply unable to determine what facts led the trial court to find that this factor favored Mother only slightly by the time of the final hearing. Instead, the trial court's finding on this factor amounts to little more than a conclusory determination that a factor favors one parent without any "factual findings whatsoever to underpin this allocation." *Grissom*, 586 S.W.3d at 397. We have previously held that such a practice is not sufficient to permit meaningful appellate review. *Id.* Thus, the trial court's findings as to Mother's role as the children's primary caregiver were both deficient and contradictory, an issue that effects more than one of the statutory best interest factors.

It is true that some of the trial court's consideration of the statutory factors contain more detailed findings than set out above. But these findings are not without their own problems. Importantly, the trial court focuses considerable attention on Mother's paramour throughout the final order. Indeed, Mr. Stamey was mentioned with regard to factors (2), (8), (9), and (12). Certainly, Mother's relationship with Mr. Stamey was relevant to some factors. *See, e.g.*, Tenn. Code Ann. § 36-6-106(a)(12) (concerning the character and behavior of individuals who frequent the home). We have difficulty, however, discerning how Mother's relationship with Mr. Stamey was relevant to factor (2)—concerning the parent's past and future potential for performing caregiving responsibilities and facilitating the relationship between the children and the other parent. Nothing in the trial court's findings as to this factor explains how Mother's relationship interfered with her performance of caregiving responsibilities or facilitation of the relationship between Father and the children. *See Sutherland v. Sutherland*, 831 S.W.2d 283, 286 (Tenn. Ct. App. 1991) ("Sexual infidelity or indiscretion does not *ipso facto* disqualify a parent from being

awarded custody. However, when the parent's sexual activities or indiscretion involve neglect of the minor child, such neglect may be considered in relation to the best interest of the minor child."). As such, we are left to wonder how the trial court's findings support its conclusion that this factor slightly favors Father. Indeed, without some guidance as to how the trial court reached its decision, we are left with doubt as to whether the trial court properly refrained from using its custody decision to penalize Mother for her decision to engage in a relationship with Mr. Stamey. *See, e.g.*, ***Ray v. Ray***, 83 S.W.3d 726, 734 (Tenn. Ct. App. 2001) (citing ***Rice v. Rice***, 983 S.W.2d 680, 683 (Tenn. Ct. App. 1998)) ("Custody decisions should not be used to punish parents for past misconduct or to award parents for exemplary behavior.").

Even more importantly, the trial court focused heavily on Mr. Stamey's testimony and credibility in its final order. But Mr. Stamey did not testify at the final hearing, nor was a transcript of his prior testimony introduced at trial. Mother asserts that under these circumstances, it was error for the trial court to rely on the prior testimony. We agree.

A similar issue was discussed in ***State v. Crowe***, No. 03C01-9606-CC-00225, 1997 WL 420779 (Tenn. Crim. App. July 29, 1997). In ***Crowe***, the defendant was charged with rape and incest. ***Id.*** at *1. His first trial resulted in a mistrial. The defendant was then prosecuted for violating his probation. As the violation of probation hearing, the State presented no proof but instead asked the judge to take judicial notice of the proof submitted at the mistrial. The judge "responded that it was not necessary for him to take judicial notice as he had heard the testimony himself." ***Id.*** No transcript of the earlier trial was therefore admitted as proof. The judge ultimately revoked the defendant's probation on the basis of the rape and incest charges. ***Id.***

On appeal, the defendant argued that because the only evidence that he committed rape or incest was the judge's memory of the prior proof, the judge had become a witness rather than a neutral arbiter. ***Id.*** at *2. The Court of Criminal Appeals tended to agree:

> Initially, we note that the trial court may take judicial notice of any fact that is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Tenn. R. Evid. 201. A court may take judicial notice of facts in an earlier proceeding in the same case, and the final action taken in the case. ***Pruitt v. State***, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 395 (Tenn. Crim. App. 1970). However, judicial notice in such cases has been applied, for instance, to recognize the previous conviction and the record on direct appeal in considering a post-conviction petition, ***Trolinger v. Russell***, 1 Tenn. Crim. App. 525, 446 S.W.2d 538, 542 (Tenn. Crim. App. 1969), a finding that a defendant is a habitual offender, ***Pruitt***, 460 S.W.2d at 395, or a proceeding for a writ of habeas corpus, ***State ex rel. Leighton v. Henderson***, 1 Tenn. Crim. App. 598, 448 S.W.2d 82, 89 (Tenn. 1969). In ***Trolinger***, the court commented that the trial court "took judicial notice of all of its prior judgments, records, etc., as

a matter of fact." 446 S.W.2d at 542.

> Considering the use of judicial notice in these cases and the requirement that judicial notice only be taken of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, the credibility of the witnesses or the weight of their testimony are not proper subjects for judicial notice. In this case, the trial court went beyond recognizing that the witnesses had testified to particular facts. He considered the credibility of witnesses who had not testified in the immediate proceeding and whose credibility had not been previously established by judgment or jury verdict. When he did so, he moved out of the realm of judicial notice and became, in effect, a witness in the proceeding. A trial court may not take judicial notice of facts based on personal knowledge. *State ex rel. Newsome v. Henderson*, 221 Tenn. 24, 424 S.W.2d 186, 188 (Tenn. 1968).

*Crowe*, 1997 WL 420779, at *3. Thus, the trial judge's action in relying on "his own recollection of the rape trial" was a "questionable procedure at best." *Id.*

The Court of Criminal Appeals further noted that the State had other avenues in which to present its proof. In fact, in revocation of probation hearings, reliable hearsay is permitted. *Id.* (citing *Practy v. State*, 525 S.W.2d 677, 680 (Tenn. Crim. App. 1974)). And under Rule 804 of the Tennessee Rules of Evidence, an exception to the hearsay rule exists for

> Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). But the State had made no effort to present a transcript from the prior trial during the revocation hearing. *Crowe*, 1997 WL 420779, at *4. So "it was [the judge's] memory of the testimony, not the transcript, upon which the trial judge relied." *Id.*

Still, the Court of Criminal Appeals did not hold that this constituted reversible error. Instead, the court noted that when the State asked the trial judge to take judicial notice of the previous proof, the defendant did not object. In fact, the defendant asked that the trial judge consider other proof that was previously submitted. The court therefore held that "by not objecting to the trial court's procedure, while even adopting the same procedure, the defendant cannot now complain of that process." *Id.* (citing Tenn. R. App. P. 36(a)). So the revocation of probation was affirmed. *Id.*

A later panel of the Tennessee Court of Criminal Appeals, however, did hold that it was reversible error for the trial judge to rely on its recollection of prior testimony. *See State v. Johnson*, No. 01C01-9510-CC-00334, 1997 WL 738582 (Tenn. Crim. App. Dec. 1, 1997). In *Johnson*, the trial court relied on its recollection of the proof presented in a prior hearing to which the defendant was not a party. *Id.* at *4. The court noted that while "the trial court can take judicial notice of its own orders and judgments in cases before it, *see Hughes v. State*, 2 Tenn.Crim.App. 71, 73, 451 S.W.2d 696, 697 (1969), reliance upon its own recall of the evidence in those cases is not the same." *Johnson*, 1997 WL 738582, at *4. Citing *Crowe*, the court opined that it was essentially "being asked to review sentencing determinations based upon the trial court's reliance upon its recollection of evidence from another trial that was not presented as evidence in this case." *Id.* But "none of [the proof relied on by the trial court] [wa]s properly a part of the record of the sentencing hearing in this case." *Id.* As a result, the court held that it had "no means of conducting a *de novo* review of the record that would lead to an educated determination of an appropriate sentence"[2] and that it was required to "vacate the defendant's sentence and remand the case for a new sentencing hearing." *Id.*

The trial court judge here did exactly what was cautioned against in *Crowe* and *Johnson*. Mr. Stamey did not testify at the final hearing.[3] Nothing in the record suggests that Father attempted to compel his testimony or that he was an unavailable witness. And even more importantly, neither party offered a transcript of Mr. Stamey's prior testimony as proof at the final hearing. Nevertheless, in its final order, the trial court relied on proof that was not presented at the final hearing, including Mr. Stamey's criminal record and Mr. Stamey's prior testimony, particularly his demeanor, credibility, and character. In fact, Mr. Stamey is mentioned at least ten times in the trial court's final best interest analysis. Yet the trial court still does not explain what facts or testimony led the trial court to conclude that he was a "horrible witness." Reference to the pendente lite order is also of little assistance, as it does nothing more than state that Mr. Stamey was a "horrible witness."[4] Thus, the trial court appears to have improperly relied upon its own recollections of Mr. Stamey's testimony in violation of the guidance provided by *Crowe*.

---

[2] We note that Tennessee now applies "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions" to criminal sentencing decisions. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). That change has no effect on *Johnson's* persuasive value for purposes of its holding that the trial court erred in relying on its recollection of prior testimony.

[3] Our observations as to Mr. Stamey are equally true as to another witness who testified at the pendente lite hearing, but not the final hearing: Father's brother-in-law. Our analysis as to the trial court's reliance on Mr. Stamey's prior testimony applies with equal force to this witness.

[4] Judges are generally permitted to take judicial notice of their prior orders. *See Mandela v. Reynolds*, No. 01-A-01-9303-CH00126, 1993 WL 236607, at *2 (Tenn. Ct. App. June 30, 1993). This circumstance illustrates the benefit of entering orders with detailed findings of fact. Had the pendente lite order contained more detailed findings about Mr. Stamey's testimony and credibility, the trial court may have been correct in relying on it. But because the prior order was so conclusory, there was little for the trial court to rely on in its final order.

Moreover, unlike in **Crowe**, it does not appear that Mother invited the error now complained of. The trial court's final order recites that Mother acknowledged that Mr. Stamey "was a terrible witness and made terrible choices." While Mother did admit that Mr. Stamey was a "horrible" witness, she did not admit that he had made terrible choices. And even to the extent that Mother admitted that Mr. Stamey was a terrible witness, nothing in the transcript or either of the trial court's orders gives us any background as to what rendered Mr. Stamey's testimony so lacking. As such, we cannot conclude that Mother waived the argument she now makes on appeal concerning the trial court's reliance on its recollection of the Mr. Stamey's testimony.

To be sure, we agree that the character and conduct of Mr. Stamey is highly relevant to the best interests of the children at issue in this case. *See, e.g.*, Tenn. Code Ann. § 36-6-106(a)(12). But the judge must be cautious that in its effort to protect children it does not cross over the invisible barrier of impartiality to become a witness or advocate for one party. *Cf.* **Nestor v. State**, 243 Md. 438, 446, 221 A.2d 364, 369 (Md. 1966) (holding that the judge's questioning did not "cross 'the line of impartiality over which the judge must not step'" (quoting **Vandegrift v. State**, 237 Md. 305, 311, 206 A.2d 250, 254 (Md. 1965)). Unfortunately, here the trial court crossed that line by appearing to rely on its own recollections of Mr. Stamey's testimony.[5]

Mother's brief points out a second issue with regard to the trial court's parenting plan, which again appears to stem from Mr. Stamey's place in Mother's life. In particular, the trial court imposed what is commonly known as a "paramour provision" in the permanent parenting plan. Although the prohibition against having overnight guests of the opposite sex applies equally to both parents, no testimony was presented to indicate that there was a concern that Father was having overnight guests. As such, this prohibition appears to be aimed at Mother's relationship.

Respectfully, the manner in which the trial court imposed this prohibition is erroneous. As an initial matter, we note that the language chosen by the trial court is fatally vague in that it prohibits all overnight guests of the opposite sex "under inappropriate circumstances." The plain language of this prohibition does not limit its application only to those times when the children are present; a plain reading of its terms suggests that it applies regardless of where the children are residing. Moreover, the caveat "under inappropriate circumstances" is not defined, leading both this Court and surely the parties to guess as to its application. In general, trial courts should endeavor to enter orders that are "clear, specific, and unambiguous" lest the court is unable to enforce its order through its contempt power. **Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.**, 249 S.W.3d 346, 354 (Tenn. 2008). Respectfully, the paramour provision contained in the permanent parenting plan falls far short of these requirements.

---

[5] We emphasize that there are no allegations of actual or apparent bias in this case against the trial judge.

The basis for the imposition of this prohibition is also lacking from the trial court's order. In general, a non-consensual paramour provision cannot be affirmed without evidence that it is in the best interests of the children. *Barker v. Chandler*, No. W2010-01151-COA-R3-CV, 2010 WL 2593810, at *6 (Tenn. Ct. App. June 29, 2010) ("Finding the record completely devoid of any evidence demonstrating that the paramour provision is in the best interests of the children or that the presence of Mother's partner in the home has any harmful effect on the children, we find that the trial court abused its discretion."); *see also* **Mashburn v. Mashburn**, No. E2015-01173-COA-R3-CV, 2016 WL 3639495, at *10 (Tenn. Ct. App. June 30, 2016) (deleting the paramour provision because no evidence was presented that the paramour's presence would pose a risk to the child); **Toyos v. Hammock**, No. W2011-01649-COA-R3-JV, 2013 WL 177417, at *36–37 (Tenn. Ct. App. Jan. 17, 2013) (vacating overnight paramour provision where trial court made no finding that allowing parent overnight visitation while a girlfriend was present "would jeopardize the child, in either a physical or moral sense") (internal quotation marks omitted); **Small v. Small**, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *19 (Tenn. Ct. App. Jan. 28, 2010) (finding "the trial court abused its discretion by imposing a restriction on Husband's visitation" where there was "no clear and definite evidence suggesting that contact with Husband's girlfriend would jeopardize the child's health or well-being"). The trial court's written order does not mention the paramour provision beyond the single sentence included in the parenting plan. As such, the order contains no finding that such a prohibition is in the best interests of the children, much less factual findings that would serve as the basis for that determination.

In sum, we agree that the trial court's best interest findings are at times vague, contradictory, and appear to rely on facts not supported by the evidence contained in the record on appeal. Due to these deficiencies, Mother asks that we reverse the trial court's decision to name Father primary residential parent and fashion our own parenting plan in which she is named primary residential parent. We note, however, that "[d]etermining a child's best interest is a fact-sensitive inquiry, and, depending upon the significance of certain facts, a single factor can control the outcome of this determination." **Solima**, 2015 WL 4594134, at *4. This Court, however, is not a fact-finder. **State v. Flake**, 114 S.W.3d 487, 506 (Tenn. 2003). In other cases where the trial court's order was insufficient, we have held that "the appropriate remedy is to vacate the judgment of the trial court and remand for the entry of an order in accordance with this opinion." **Nelvis v. Baptist**, No. W2018-01763-COA-R3-JV, 2019 WL 5566352, at *7 (Tenn. Ct. App. Oct. 29, 2019). Indeed, the Court of Criminal Appeals held that vacatur of the trial court's judgment is the proper remedy when the trial court improperly relies on its own recollections of prior testimony. **Johnson**, 1997 WL 738582, at *4.

We therefore conclude that the appropriate remedy here is likewise to vacate the judgment of the trial court and remand for the entry of an order in accordance with this Opinion. The trial court may, in its discretion reopen the proof as to the circumstances that

existed at trial. Moreover, the trial court may consider the circumstances that exist currently. *See, e.g.*, **Wall v. Wall**, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *26 (Tenn. Ct. App. July 14, 2011) ("[E]vents and lives have not stood still while this custody dispute has been in the courts." (quoting **Gorski v. Ragains**, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999))); **In re Carter K.**, No. M2017-01507-COA-R3-JV, 2018 WL 896060, at *6 (Tenn. Ct. App. Feb. 14, 2018) ("In light of the passage of time and events taking place in the lives at stake, the juvenile court may, in its discretion, consider additional evidence to ensure that any custody order is based on the parties current actual circumstances.").

Finally, Mother seeks an award of the attorney's fees she incurred in this appeal[6] under Tennessee Code Annotated section 36-5-103(c):

> A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Section 36-5-103(c) "authorizes courts to award reasonable attorney's fees to the prevailing party in an action to enforce any decree for alimony, child support, or child custody." **Eberbach v. Eberbach**, 535 S.W.3d 467, 475 (Tenn. 2017). Fees under this statute may be awarded for both trial court proceedings and on appeal. *Id.* Such "awards for legal expenses in custody or support proceedings are 'familiar and almost commonplace.'" **Sherrod v. Wix**, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992) (quoting **Deas v. Deas**, 774 S.W.2d 167, 170 (Tenn. 1989)); *see* **Eberbach**, 535 S.W.3d at 476. "In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case." **In re C.W.**, 420 S.W.3d 13, 22 (Tenn. Ct. App. 2013) (quoting **Darvarmanesh v. Gharacholou**, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005). Given the success of Mother's arguments and the equities of this case, we conclude that Mother should be awarded her reasonable attorney's fees incurred in this appeal.

## IV. CONCLUSION

---

[6] The trial court ruled that each party would pay their respective attorney's fees incurred in the trial court. Mother has not taken issue with this ruling, so we infer that her position on appeal is that she should be awarded attorney's fees incurred solely in this appeal.

The order of the Maury County Chancery Court is vacated and this cause is remanded for further proceedings consistent with this Opinion and for the determination of Appellant Jessica Lynne Camacho's reasonable attorney's fees incurred in this appeal. Costs of this appeal are assessed against the Appellee, Matthew Reyes Camacho, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE
